**Mary McMULLAN, et al.**

v.

**The Honorable Dick THORNBURGH, et al.**

Civ. A. No. 79–3431.

United States District Court, E.D. Pennsylvania.

Aug. 19, 1983.

John M. Gallagher, Media, Pa., Alan M. Lerner, Philadelphia, Pa., for plaintiffs.

William J. Taylor, Philadelphia, Pa., for defendants.

## OPINION

LOUIS H. POLLAK, District Judge.

### I.

Local Registrars of Vital Statistics (hereinafter "local registrars") are employees of the Pennsylvania Department of Health who are responsible for the issuance of birth and death certificates in suburban and rural areas. Compensated on a fee-for-certificate basis, local registrars typically work only part-time, and very frequently they perform their official duties out of their homes. In late August of 1979, Pennsylvania's Secretary of Health sent identical letters to a number of incumbent local registrars advising them that they were discharged effective September 11, 1979. The decision to discharge a number of local registrars was approved by the defendant, Governor Richard Thornburgh.

The eight plaintiffs, residents of Delaware and Montgomery Counties, are among the discharged local registrars. They brought this lawsuit, pursuant to 42 U.S.C. § 1983, to challenge Governor Thornburgh's discharge decision as it related to them. Specifically, plaintiffs alleged that they were selected for discharge because they were Democrats. Plaintiffs contended that termination of their public offices because they belonged to the "wrong" political party contravened the constitutional teaching of *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Plaintiffs sought reinstatement and "back pay"—i.e., reimbursement for the fees which, but for their wrongful discharge, would have inured to them from the date of termination, September 11, 1979, to the hoped-for date of reinstatement.

At trial, defendant Thornburgh undertook to show that plaintiffs' removal from office—although apparently welcomed and even encouraged by some county-level Republican loyalists—was not viewed at the gubernatorial level as conventional party warfare. From the Governor's perspective, the removal of plaintiffs and others was the first step in a Thornburgh administration plan to reform the birth-and-death recorda-

tion process. The Governor's stated long-term objective was to abolish the local registrar system—a time-honored cornucopia of party patronage but not a model of efficient public administration—and transfer responsibility for the issuance of birth and death certificates to regional offices of the Department of Health. Replacing Democratic local registrars with non-Democrats was represented as a short-term device calculated to make the eventual disappearance of the registrar system a matter of political indifference to the Democratic Party. Thus, according to testimony adduced by defendant at trial, the Thornburgh strategists believed, or at least hoped, that Democratic members of the Legislature would not stand in the way of the legislation required to dismantle the local registrar system.

Plaintiffs, for their part, sought to show at trial that the Governor's proposed reform was a misdirected effort to fix something that wasn't broken; that it was politically unattainable; and, indeed, that it was not even seriously intended—which is to say that it was an ineffective camouflage for patronage-as-usual.

Concluding that (a) the Governor's asserted rationale for removing local registrars, whatever its tactical weaknesses, was pursued in good faith, but (b) that the Governor's good faith did not constitute a legally adequate justification for selecting persons for dismissal from public office on account of their party affiliation, this court found that plaintiffs had established their claims under the principles announced in *Elrod v. Burns, supra,* as further elaborated in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Accordingly, this court ordered plaintiffs restored to their posts with back pay. *McMullan v. Thornburgh,* 508 F.Supp. 1044 (E.D.Pa.1981). The Court of Appeals affirmed. 671 F.2d 496 (3d Cir. 1981). And the Supreme Court denied certiorari. 454 U.S. 1147, 102 S.Ct. 1010, 71 L.Ed.2d 300 (1982).

Thereupon plaintiffs were reappointed as local registrars. However, in order to keep places for the persons appointed in 1979 as

plaintiffs' successors, the Department of Health redrew the registrar districts and awarded plaintiffs and their successors smaller domains than they had hitherto occupied. Since a smaller district meant fewer births and deaths and hence fewer certificates and lower fees, plaintiffs sought a determination that Governor Thornburgh was in contempt of this court's order of reinstatement. This court did not find the Governor in contempt but did determine that its reinstatement order had not been satisfactorily complied with. Pursuant to that determination, plaintiffs were restored to the precise districts which had been theirs in September of 1979; in addition, they received an aggregate back pay award of $152,104.72. This completed disposition of the merits of this extended litigation.

## II.

What remain for disposition are plaintiffs' petitions for counsel fees and costs. The petitions will be dealt with in three parts—(A) the fees sought to recompense plaintiffs' counsel for handling the merits of the controversy; (B) the fees sought to recompense counsel for the work done in petitioning this court for the fees sought for handling the merits; and (C) costs.

### A. Plaintiffs' Counsel Fees For Representation On The Merits

With respect to the merits of this litigation, plaintiffs have been represented throughout by the Media firm of Richard, Brian, DiSanti and Hamilton. In the early months, Jack Brian, a senior partner, and John M. Gallagher, Jr., a junior partner, had joint charge of the case. Mr. Brian withdrew from active practice in January of 1980. Thereafter, Mr. Gallagher took full command, and he in fact personally conducted almost every phase of the pre-trial, trial, appellate and compliance phases of the litigation: for part of 1980 Mr. Gallagher had the very limited assistance of two associates, but he has done everything himself from November of 1980 onward. The firm's aggregate hours spent on the merits came to 540.6; of these, 25.5 hours are credited to Mr. Brian,[1] 502.5 hours are credited to Mr. Gallagher,[2] 10.1 hours to R.B. Pavelow,[3] and 2.5 hours to A.S. Walsh.[4]

To turn these raw data into a proper award of counsel fees, it is necessary to pursue the steps mapped out by the Third Circuit in *Lindy*[5] and related opinions.[6]

#### 1. Determining the "lodestar"

The "lodestar" is a dollar figure arrived at by (1) determining, as to each lawyer who worked on plaintiffs' prevailing claims, (a) the number of hours spent by that lawyer on professional services reasonably related to those claims and (b) the hourly rate proper for that lawyer; (2) multiplying hours times hourly rate for each lawyer; and (3) adding those products to arrive at an aggregate dollar figure for plaintiffs' lawyers' time spent. That aggregate dollar figure is the lodestar.

There can be no serious quarrel with the 540.6 hours devoted by plaintiffs' counsel to the merits of this lengthy and demanding

---

1. At a claimed hourly rate of $125.

2. 208.6 of Mr. Gallagher's hours were between September of 1979 and May of 1980, when Mr. Gallagher's claimed hourly rate was $100; 186.7 hours were between June of 1980 and October of 1981, when Mr. Gallagher's claimed hourly rate was $125; and 107.2 have been since November of 1981, when Mr. Gallagher's claimed hourly rate rose to $135. (Calculation of the post-November 1981 hours has been complicated by the entry "11.9" for hours listed on the third line of page 2 of Alan M. Lerner, Esq.'s letter to the court of June 17, 1983; evidently the intended entry was "91.9.").

3. At a claimed hourly rate of $50.

4. At a claimed hourly rate of $50.

5. *Lindy Bros. Builders v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973) and 540 F.2d 102 (3d Cir.1976).

6. See especially the *Merola* cases (*Merola v. Atlantic Richfield Co.*, 493 F.2d 292 (3d Cir. 1974) and 515 F.2d 165 (3d Cir.1975)); *Prandini* cases (*Prandini v. National Tea Co.*, 557 F.2d 1015 (3d Cir.1977) and 585 F.2d 47 (3d Cir. 1978)); *Rodriguez v. Taylor*, 569 F.2d 1231 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978); and *Hughes v. Repko*, 578 F.2d 483 (3d Cir.1978).

litigation. Morgan, Lewis & Bockius, the firm retained to represent Governor Thornburgh, spent about twice as many hours in defending against plaintiffs' claims.

With respect to a proper hourly rate: First, there can be no real quarrel with the claimed $125 hourly rate of Mr. Brian for his 25.5 hours.[7] Second, there is certainly no question as to the propriety of the modest $50 per hour claimed for the 12.6 hours of Messrs. Pavelow and Walsh.[8] What presents some difficulty is determining the proper hourly rate, at different times, of Mr. Gallagher, whose 502.5 hours constitute the lion's share of the representation: For approximately two-fifths of these hours—208.6—Mr. Gallagher's time is valued by plaintiffs at $100 per hour, the hourly rate at which Mr. Gallagher's time was billed to other clients from September of 1979, when this representation began, through May of 1980. For the 186.7 hours spent between June of 1980 and October of 1981, plaintiffs seek $125 per hour, the rate at which Mr. Gallagher's time was then being billed to other clients. And for 107.2 hours spent since November of 1981, the requested rate is the $135 per hour to which Mr. Gallagher's billable rate had by then ascended.

Mr. Gallagher, who commenced practice in 1969, is a seasoned trial lawyer and has had considerable experience in civil rights litigation; but he is not yet a senior member of the bar, nor a lawyer with a broadly recognized expertise in constitutional litigation. Mr. Gallagher does not, for example, have the long and varied experience of his erstwhile senior partner, Mr. Brian, whose hourly billing rate was $125 when he retired in 1980. Nor does Mr. Gallagher have the years and rank at the bar of William J. Taylor, Esq., chief counsel for Governor Thornburgh in this case. Mr. Taylor, one of the top litigators at Morgan, Lewis & Bockius when this case commenced, and now head of his own firm, on occasion commands (at least) $150 per hour.[9] And, while of comparable age, Mr. Gallagher does not have the special competence in constitutional litigation possessed by the attorney retained by Mr. Gallagher in connection with this fee petition, Alan M. Lerner, Esq., of Cohen, Shapiro, Polisher, Shiekman & Cohen, whose hourly billing rate went from $100 to $110 in 1980, then to $125 in 1981 (cf. *Shadis v. Beal,* No. 75–3421 (E.D.Pa., March 12, 1982) *affirmed,* 703 F.2d 71 (3d Cir.1983)), to $135 in 1982 and to $150 this year.

Setting a proper hourly rate, or series of hourly rates, for Mr. Gallagher is further complicated by the fact that Mr. Gallagher has personally conducted approximately 90% of plaintiffs' case. In most litigation of substantial scope, it is quite unusual for the senior attorney to carry, in point of hours, the laboring oar. The senior attorney is concerned not to dissipate the firm's most valuable resource—the senior attorney's own time—on inessentials. And the senior attorney is also reluctant to saddle the client with time-charges measured at the senior attorney's rate unless the particular professional service involved really calls for the investment of the senior attorney's own time. With this in mind, the senior attorney typically delegates to associates and younger partners such chores as primary legal research; the initial drafting of pleadings, interrogatories, motions and briefs; and preparation for and frequently the actual conduct of depositions. This means that, typically, the senior attorney tries to limit personal participation to (1)

---

7. Mr. Brian, a senior partner who had formerly been a Judge of the Delaware County Court of Common Pleas, came to the bar in 1953 and retired from active practice early in 1980, shortly after the commencement of this litigation.

8. The firm's hourly rate for these two associates rose to $75 in December of 1980.

9. Perry Bechtle, Esq., defendant's expert witness on counsel fees, testified that in hiring other attorneys to conduct substantial defense litigation he has seldom agreed to an hourly rate for a particular attorney in excess of $100. Exceptions have included Mr. Taylor ($150) and also Thomas Masterson, Esq. ($200), of Morgan, Lewis & Bockius, in instances in which the magnitude of the risk made the incremental cost of the senior attorney's hourly rate a matter of relative indifference.

carrying the client's banner at significant in-court conferences and arguments and at the trial itself, and (2) handling those out-of-court aspects of the litigation which insistently demand the senior's presence—e.g., initial client contact; development and subsequent monitoring of over-all strategy; final review of draft pleadings and briefs; conduct of key depositions; preparation of the chief trial witnesses; and conduct of settlement negotiations.[10]

■ Plaintiffs contend that Mr. Gallagher's virtually single-handed conduct of this case reflected his professional judgment that fidelity to his clients' vindication of significant and difficult claims required his personal involvement at all points. The operative question is not, however, whether Mr. Gallagher's professional judgment is to be second-guessed. The operative question is whether defendant should bear the dollar burden of paying for every hour of Mr. Gallagher's professional services at the rate which would appropriately compensate Mr. Gallagher for the fulfillment of his most demanding responsibilities. The answer is no. Where a plaintiff in a civil rights case retains a law firm whose younger partners and associates are not numerous enough, or not sufficiently skilled in litigation, to handle those litigation tasks which would in most law firms customarily be delegated to juniors, Congress cannot have intended that a losing defendant should, as an additional ingredient of plaintiff's counsel fees, be saddled with the dollar burden of the plaintiff's firm's uneconomic allocation of the senior attorney's professional time.

It seems proper, therefore, to calculate Mr. Gallagher's hourly rate by reference to two different standards, depending on the nature of the professional services and the time-period during which those services were performed. For in-court conferences and hearings, and out-of-court services requiring the senior attorney's involvement, Mr. Gallagher's customary hourly billing rate for the time period in question will be utilized.[11] It would, of course, be idle to contend that this record is sufficiently informative to support precise findings as to which out-of-court services necessitated drawing on Mr. Gallagher's highest skills and which did not. Bearing in mind that the burden of proof rests with plaintiffs to justify counsel fees, certain inferences can confidently be drawn at both ends of the spectrum—e.g., Mr. Gallagher was on sound ground in concluding that he personally had to depose certain key defense witnesses and consult with his own key witnesses about deposition and/or trial testimony; but Mr. Gallagher has not shown why junior attorneys, if available, could not have handled most of the depositions, shouldered the major burden of drafting written submissions, made the bulk of the innumerable routine telephone calls, etc. (Nor is it apparent why Mr. Gallagher's travel time to and from depositions, court-appearances and the like should be charged at his prime billing rate). Further inquiry by this court seems unwarranted, since it would not appear to be the court's responsibility—certainly not, *sua sponte*—to pursue "a detailed analysis of the lawyer's performance in each category of services rendered." *Lindy II,* 540 F.2d at 118. In lieu of such a "detailed analysis," this court will presume that one-fourth of Mr. Gallagher's out-of-court hours were

**10.** It is to be noted that defendant's retainer of Morgan, Lewis & Bockius in this case provided for compensation at a rate of $100 for each attorney-hour, without regard to what attorney of what seniority performed what service. This retainer presumably contemplated that Mr. Taylor, the partner in charge, would personally perform only a small fraction of the required professional services. See *supra* note 9.

**11.** If Mr. Gallagher had no customary billing rate, and it therefore became necessary to calculate what rate he could on average probably command, the $125 per hour sought for June 1980 to October 1981, and the $135 as of November 1981, would seem high, since they are substantially on a parity with the rates for those time periods of the more experienced Mr. Lerner. But Mr. Gallagher testified that he has routinely charged clients at the stated rates; and two knowledgeable senior practitioners have submitted affidavits that Mr. Gallagher's rates are in accord with prevailing Media standards for leading attorneys of firms of Mr. Gallagher's firm's standing at the bar.

devoted to services which ought optimally to have been handled by the senior attorney notwithstanding the additional cost of such skilled representation. This means that in calculating the lodestar, Mr. Gallagher's in-court hours and one-fourth of his out-of-court hours will be charged at Mr. Gallagher's prevailing prime rate for the time period in question—i.e., $100 per hour from September of 1979 through May of 1980; $125 from June of 1980 through October of 1981; and $135 from November of 1981 onwards. For the other three-fourths of Mr. Gallagher's out-of-court hours, the lodestar calculation will utilize, for each of the three time periods, a hypothetical hourly rate adequately compensating a hypothetical partner junior to Mr. Gallagher. That hypothetical rate should, of course, be lower than Mr. Gallagher's billing rate but higher than the billing rate of associates Pavelow and Walsh, which was $50 in 1979 and early 1980 and rose to $75 in December of 1980. Proper rates for the residual three-fourths of Mr. Gallagher's out-of-court hours would, therefore, seem to be as follows: $85 from September 1979 through May of 1980; $95 from June of 1980 through October of 1981; and $100 from November of 1981 onward. The resultant calculations, which are based on Mr. Gallagher's time-records, are as follows:

(a) *Mr. Gallagher's Time Charges for September 1979 through May 1980:*

Mr. Gallagher's time-records show him to have spent 208.6 hours from September of 1979 through May of 1980. Mr. Gallagher was in court for 1 hour on October 1, 1979, 2 hours on October 23, 1979, 6 hours on April 16, 1980, 2.1 hours on April 17, 1980, 2.6 hours on April 18, 1980, 3.3 hours on May 1, 1980, and 4.2 hours on May 2, 1980. Thus, Mr. Gallagher logged 21.2 in-court hours at an hourly rate of $100 for $2120. His 187.4 out-of-court hours are charged as follows: (a) 46.85 hours at an hourly rate of $100 = $4685; (b) 140.55 hours at an hourly rate of $85 = $11,946.75. Mr. Gallagher's total time charges for the period = $18,751.75.

(b) *Mr. Gallagher's Time-Charges for June 1980 through October 1981:*

From June of 1980 through October of 1981, Mr. Gallagher devoted 186.7 hours to plaintiffs' case. During this period, Mr. Gallagher was in court as follows: 6.8 hours on September 23, 1980, 5 hours on October 14, 1980, 4.5 hours on December 4, 1980, and 2.3 hours on December 5, 1980. Mr. Gallagher's 18.6 in-court hours, at $125 per hour, come to $2325. His 168.1 out-of-court hours are charged as follows: (a) 42 hours at an hourly rate of $125 = $5250; (b) 126.1 hours at an hourly rate of $95 = $11,979.50. The total time charges for the period = $19,554.50.

(c) *Mr. Gallagher's Time-Charges From November 1981 Onward:*

From November 1981 onward, Mr. Gallagher has spent 107.2 hours on the merits. Mr. Gallagher's time-charts show 1 in-court hour on March 3, 1982, and 3 in-court hours on May 11, 1982. At $135 per hour, the in-court hours come to $540. His 103.2 out-of-court hours are charged as follows: (a) 25.8 hours at an hourly rate of $135 = $3483; (b) 77.4 hours at an hourly rate of $100 = $7740. The total time charges for the period = $11,763.

To calculate the lodestar, we must add to Mr. Gallagher's time-charges the time-charges allocable to the services of Mr. Brian (25.5 hours at $125 per hour = $3187.50) and Messrs. Pavelow and Walsh (12.6 hours at $50 per hour = $630). The addition is as follows:

| | |
|---|---:|
| Mr. Brian | $ 3,187.50 |
| Messrs. Pavelow and Walsh | 630.00 |
| Mr. Gallagher | 18,751.75 |
| | 19,554.50 |
| | 11,763.00 |
| | $53,886.75 |

The sum—$53,886.75—is the lodestar.

2. *Determining the "multiplier"*

In the *Lindy* jurisprudence, the lodestar is only the beginning of wisdom. Once the lodestar has been determined, it is necessary to determine whether an increase, or decrease, of the lodestar is warranted by the particulars of the litigation. The proportion by which the lodestar is to be modi-

fied, either up or down, is the so-called "multiplier."

(a) *The contingent nature of the litigation*

■ *Lindy II* directs that in determining the multiplier the first factor to be appraised is the contingent quality of the litigation: "the professional burden undertaken—that is, the probability or likelihood of success, viewed at the time of filing suit." 540 F.2d 102, 117. The principal elements of this appraisal are (1) whether plaintiffs' legal theory was untried or well-established, and (2) whether the factual ingredients of plaintiffs' legal theory appeared difficult or easy to prove. When plaintiffs commenced this lawsuit in the fall of 1979, the undergirding constitutional principle that government employees may not be selected for discharge on the basis of party affiliation had been announced by the Supreme Court just three years before in *Elrod v. Burns, supra.* And the strongly persuasive facts that plaintiffs were Democrats, that there was express Republican interest in regaining local registrarships held by Democrats, and that those chosen to succeed plaintiffs were Republicans, could not have seemed very difficult to demonstrate. Thus, the issues presented were not—with but one exception—unusual ones. The exception stemmed from Governor Thornburgh's principal line of defense— that Democratic local registrars were removed not for patronage purposes but to facilitate a transition to a wholly apolitical registrar system. While this court did not find any prior cases which involved a defense of just this sort, this court concluded that the defense, while novel and hence not precluded by any squarely controlling authoritative precedent, was unavailing to defeat the principles announced in *Elrod v. Burns* and *Branti v. Finkel.* That the Third Circuit, notwithstanding defendant's vigorous advocacy to the contrary, regarded plaintiffs' case as relatively clear-cut is evidenced by the fact that the court's affirm-

ance was a *per curiam* judgment order (one member of that court, noting his disagreement with *Elrod v. Burns* and *Branti v. Finkel,* concurred).

Defendant's enterprising, albeit unpersuasive, effort to take this case out of the *Elrod-Branti* rubric is evidence of the vigor with which plaintiffs' claims were met. Morgan, Lewis & Bockius—the largest, and one of the finest, law firms in the Commonwealth—was retained to represent the Governor; and, with William Taylor in charge of the defense, plaintiffs' claims were tenaciously resisted, in law and in fact, at every turn. To meet the defense on even terms, Mr. Gallagher's small law firm was obliged to invest hundreds of Mr. Gallagher's scarce hours and $5547.54 in costs and expenses.[12] In retrospect, one can say that plaintiffs from the outset had a strong case, and hence that, objectively viewed, the risk that plaintiffs' counsel would come away empty-handed was remote. Nonetheless, subjectively viewed, it is easy to surmise that at the commencement of the case Mr. Gallagher may not have felt altogether sanguine in throwing down the gauntlet to the Governor and Mr. Taylor.

A salient aspect of the energy with which the Governor and his attorneys fought this case is that they never gave up—even after the denial of certiorari: As already noted, in the face of a Department of Health reshuffling of registrar districts, plaintiffs were forced to return to court for a further order underscoring that the remedy of reinstatement contemplated full reinstatement to the very positions from which plaintiffs had been discharged and nothing less.

The fact that the litigation was not only hard-fought but long-drawn-out underscores a further factor which, under the *Lindy* rules, is an element of "contingency": namely, the factor of delay in the receipt by prevailing counsel of the fees to which they are entitled. Two-thirds of the professional time invested in the merits by Mr. Gallagh-

---

**12.** The Democratic State Committee advanced $1627.26 to assist in covering these expenditures.

er and his colleagues was spent in 1979 and 1980. In December of 1980, the case was decided on the merits in full vindication of plaintiffs' claims. But two-and-a-half years have since elapsed in pursuing what are essentially postscripts to that determination. Defendant was of course fully entitled to take his appeal, and then to seek certiorari. And after the denial of certiorari, defendant was at least marginally entitled to try to get plaintiffs to accept half-a-loaf of remedy in lieu of a full loaf (though one may be skeptical that defendant's advisers could really have expected a court to accept the maneuver as compliance with the court's manifest expectation that plaintiffs were to be made whole). And of course defendant was plainly entitled to require that plaintiffs be put to their proofs with respect to the fee petition. But it seems to be contemplated by the equitable *Lindy* calculus that a defendant should bear a substantial portion of the dollar detriment attendant on delay—and most especially when defendant is accountable for much of that delay. In *Vecchione v. Wohlgemuth,* 481 F.Supp. 776 (E.D.Pa.1979), which involved a comparable lapse of time, Judge Becker decided to "increase the lodestar by 10% to compensate counsel for the delay in recovery of the fee." *Id.* at 795. There, to be sure, the court felt that the increase had the side benefit of "penalizing highly culpable defendants," *ibid.,* a rationale without application here. Accordingly, an 8% increase in the lodestar would seem in this case to be an appropriate response to the factor of delay.

(b) *The qualify of the professional services performed*

In *Lindy II* the Court of Appeals observed (540 F.2d at 118):

Lindy I . . . permits an adjustment to the "lodestar"—up or down—based on the all-round performance of counsel in the specific case: "Any increase or decrease in fees to adjust for the quality of work is designed to take account of an unusual degree of skill, be it unusually poor or unusually good." 487 F.2d at 168. By this is meant simply that the district court may determine that the lawyer discharged the professional burden undertaken with a degree of skill above or below that expected for lawyers of the caliber reflected in the hourly rates.

In this case, the lawyering performed by Mr. Gallagher's firm on plaintiffs' behalf has certainly been of creditable quality. Creditable professional work is, however, exactly what one would anticipate from a firm compensated at the hourly rates reflected in the lodestar.[13] Thus, from the point of view of craftsmanship, one cannot say that plaintiffs' counsel operated "with a degree of skill above . . . that expected." One can say, however, that Mr. Gallagher's firm was fully a match for Morgan, Lewis & Bockius, which did the creditable work one would expect of a firm which (a) as a general matter enjoys great prestige, and (b) conducted this particular litigation on the basis of what would appear to be a quite congenial hourly-rated retainer.[14]

In matching the efforts of defense counsel, and in doing so in half the hours they expended, plaintiffs' counsel did show their mettle. What they displayed was disciplined stamina. For this, plaintiffs' counsel should receive a 5% increase in the lodestar.

(c) *Vindicating the Civil Rights Acts*

In *Hughes v. Repko,* 578 F.2d 483, 489 (3d Cir.1978), the Court of Appeals instructed district courts to "evaluate the fees to be awarded [in civil rights cases] in light of the important substantive purposes" of the federal civil rights laws.

---

**13.** For the 540.6 hours spent on the merits by Mr. Gallagher's firm, the lodestar is $53,886.75, which works out to be an aggregate average hourly rate of approximately $100.00.

**14.** See note 10, *supra.* The Morgan, Lewis & Bockius hourly retainer of $100 is approximately the same as the lodestar hourly rate of plaintiffs' counsel (see note 13, *supra*), but it is unlikely that Mr. Taylor, defendant's senior attorney, felt obliged to make anything like the personal time commitment made by Mr. Gallagher on plaintiffs' behalf.

It cannot be said that plaintiffs' victory in the instant litigation has significantly broadened the doctrinal scope of *Elrod v. Burns* and its sequel, *Branti v. Finkel, supra,* or greatly enhanced the effectiveness of the remedies available thereunder. But the litigation did make whole, by reinstatement and by recoupment of back pay, a group of persons whose rights were infringed by decisions taken—in benign disregard of constitutional principles announced by the Supreme Court only a few years before—at the highest levels of state government. From one perspective, the litigation seems prosaic—the plaintiffs are ordinary people and the jobs they lost were ordinary jobs. But from another perspective the litigation seems vital: Protecting the sovereignty of ordinary people is the chief business of the constitutional order, and the Court in *Elrod-Branti* certainly contemplated that vindicating the First Amendment rights of government employees carried with it the important dividend of promoting the integrity of governmental processes. Because the vindication of constitutional guarantees through the judicial process depends in large measure on the availability of lawyers to conduct litigation of this sort, an increase in the lodestar in recognition of plaintiffs' well-deserved victory seems proper. Bearing in mind that plaintiffs have regained their jobs and a sum which is approximately three times the size of the lodestar, but also bearing in mind that plaintiffs' victory is not one of widely ramified precedential or structural consequence, a lodestar increase of 11% will suffice.

3. *Calculating plaintiffs' counsel fee for the merits of the case*

The lodestar is $53,886.75. The multiplier—8% plus 5% plus 11%—is 24%. The total fee for plaintiffs' counsel's representation on the merits is, therefore, $66,819.57.

B. *Plaintiffs' Counsel Fees For The Fee Petitions*

■ Initially, Mr. Gallagher prepared and filed a fee petition on plaintiffs' behalf.

Then in the spring of 1982, Mr. Gallagher retained Alan M. Lerner, Esq., and Susanna E. Lachs, Esq., of Cohen, Shapiro, Polisher, Shiekman & Cohen, to prepare a superseding fee petition. This second submission, succinctly denominated an "Amended and Supplemental Motion for the Award of a Reasonable Attorney's Fee and for Reimbursement of the Costs and Expenses of Litigation," has been the principal documentary basis for the fee claim on the merits which has been canvassed in Part II(A) of this Memorandum. The "Amended and Supplemental Motion" was itself the precursor of many more pieces of paper—including a motion to discover records of defense counsel which was denied, renewed and denied again—and of in-court hearings on March 28, 1983 and April 25, 1983.

These activities have triggered the following additional requests for counsel fees:

(1) $3,329 for 25.4 hours spent by Mr. Gallagher in connection with plaintiffs' initial counsel fee application before plaintiffs retained Cohen, Shapiro, Polisher, Shiekman & Cohen (hereinafter, "the Cohen firm"). The dollar amount claimed is geared to Mr. Gallagher's customary billing rate for the time periods in question: 10 hours at $125; 15.4 hours at $135.

(2) $2,527 for 18.7 hours, at the billing rate of $135, spent by Mr. Gallagher in aid of the efforts of the Cohen firm which culminated in the "Amended and Supplemental Motion."

(3) $11,965.75 ($9,675.25 originally applied for in the "Petition For Award of A Reasonable Attorney's Fee" plus a $2,290.50 supplementary application reflecting Mr. Lerner's in-court appearances on 3/28/83 and 4/25/83) for 142.15 legal and paralegal hours spent by the Cohen firm in connection with the "Amended and Supplemental Motion" and related efforts seeking counsel fees, on plaintiffs' behalf, for Mr. Gallagher's firm.[15]

---

15. In his letter of June 17, 1983, Mr. Lerner included the following table detailing the fee

claim regarding the original petition, (a column

(4) $1,396.50 for 39.9 paralegal hours spent by the Cohen firm in preparing the Cohen firm's original fee application.

Before these four additional requests are considered, some computational errors, resulting in the requests for the above sums, must be corrected.

(i) Request (2) should be for the amount of $2,524.50, assuming that 18.7 hours were spent by Mr. Gallagher at a billing rate of $135.

(ii) Request (3) should be for the amount of $11,960.90. This is the sum of the corrected figure of $9,673.40 (arrived at by adding $8,343.40 + $1330—see footnote 15) and $2,287.50 (which is the correct product of 15.25 hours and $150).

The four requests will now be considered in turn:

(1) The 25.4 hours spent by Mr. Gallagher in connection with the initial application will be credited as follows: 3 of the first 10 hours will be credited at Mr. Gallagher's then hourly billing rate of $125, for $375; the other 7 hours will be credited at the hypothetical junior partner rate of $95 utilized *supra* (in calculating the fee on the merits) for that time period, for $665. Of the subsequent 15.4 hours, 4 hours will be credited at Mr. Gallagher's then billing rate of $135, for $540; the other 11 hours will be credited at the hypothetical junior partner rate of $100 utilized for that time period, for $1100. The total = $2680.

(2) The fee sought for Mr. Gallagher's 18.7 hours spent after the retainer of the Cohen firm will be disallowed. Having transferred the responsibility for legal representation of plaintiffs

has been affixed by this court to show the correct computations):

III. Fee Claim for A.M. Lerner, Esquire and the "Cohen Firm"

A. Per original Petition:
(1) For representation of J.M. Gallagher and the "Richard Firm"

| Person | Hours | | Rate | | Fee Time | Correct Fee Time | Difference |
|---|---|---|---|---|---|---|---|
| A.M. Lerner | 21.7 | | $135. | = | $2,929.50 | | |
| S.E. Lachs | 29.5 | | 85. | = | 2,507.50 | | |
| A.M. Porreca | 20.4 | x | $ 35. | = | $ 716.25 | $ 714.00 | +2.25 |
| C.S. Shearer | 2.9 | x | 40. | = | 116.00 | | |
| W.A. Rink | 2. | x | 40. | = | 80.00 | | |
| J.J. Taylor | 38.80 | x | 38. | = | 1,474.00 | 1,474.40 | −0.40 |
| S. Raridon | 11.6 | x | 45. | = | 522.00 | | |
| Total | | | | | $9,675.25 | $8,343.40 | $1,331.85 |

(* Ms. Lachs' billing rate changed from $85.00 per hour to $95.00 per hour on Nov. 1, 1982).

As shown in the table, the discrepancy between the grand total applied for and the corrected grand total is $1331.85. Both the discrepancy and the remark referring to a change in Ms. Lachs' billing rate were puzzling. However, an examination of the earlier "Petition for Award of a Reasonable Attorney's Fees" provided an explanation. There, the following data and remark were included in a table similar to the one given above:

```
--------------------------------------------
Susanna E. Lachs
Attorney/     43.50     $85.00*     $3,837.50
Associate
* Effective 11/1/82, Ms. Lachs' billing rate in-
creased from $85.00 per hour to $95.00 per hour.
--------------------------------------------
```

This meant that the 43.50 hours were billed partly at $85 per hour and partly at the higher rate of $95 per hour. The letter of June 17th disclosed that 29.5 hours were billed at the lower rate. So, it follows that 14 hours (i.e., 43.50–29.5) were billed at the higher rate of $95 per hour, yielding a total of $1330. This total, together with the minor computation errors ($2.25 + (− $0.40) = $1.85; see above table) accounts for the whole discrepancy of $1,331.85.

Thus under the assumption that the following line was inadvertently deleted from the table contained in the June 17, 1983, letter,

```
--------------------------------------------
S. E. Lachs      14      $95      1330
--------------------------------------------
```

both the discrepancy and the remark about the change in Ms. Lachs' billing rate are explained.

on the counsel fee facet of the case from himself to the Cohen firm, Mr. Gallagher had by then become, functionally, not a lawyer but a resource person (or, arguably, a client) on this issue.

(3) The fee sought by the Cohen firm for representing plaintiffs in connection with plaintiffs' application for counsel fees for Mr. Gallagher's firm is allowed in the amount of $10,500. The reduction takes account of two factors: (i) clerical errors in plaintiffs' papers (see especially footnote 15, *supra*) which have somewhat complicated the court's task in computing proper fees;[16] (ii) the court's view that time spent unsuccessfully renewing the discovery motion to compel the production of defense counsel's records is not time the Commonwealth should be required to pay for—*a fortiori* in view of the fact that a portion of the records were public documents freely available to, and thereafter secured by, the Cohen firm without court process. The court considered a further reduction of the Cohen fee on the ground that hourly rates of $85 and $95 for Ms. Lachs, a 1978 law school graduate whose time was billed at $50 per hour in 1980, *Shadis v. Beal*, No. 75–3421, slip op. at 3 (E.D.Pa. March 12, 1982), seemed excessive; but the court decided that no reduction was necessary because the bulk of the work of the Cohen firm was done by paralegals whose time is billed at quite modest hourly rates.

(4) The court disallows the Cohen firm's application for counsel fees for "the time the Cohen firm spent preparing its own fee petition." *Shadis v. Beal*, 703 F.2d 71, p. 73 (3d Cir.1983).

### C. Costs and Expenses

There appearing to be no basis for questioning the amounts sought, the court approves $5,547.54 in costs and expenses for Mr. Gallagher's firm and $181.98 in costs and expenses for the Cohen firm.

### Conclusion

In an accompanying Order, defendant is directed to pay (1) to Mr. Gallagher's firm (Richard, Brian, DiSanti & Hamilton) (a) counsel fees in the amount of $66,819.57 for representing plaintiffs on the merits, and (b) counsel fees in the amount of $2,680 for work done in pursuit of plaintiffs' petition for counsel fees on the merits, and (c) costs and expenses in the amount of $5,547.54; and (2) to the Cohen firm (Cohen, Shapiro, Polisher, Shiekman & Cohen) (a) counsel fees in the amount of $10,500 for work done in pursuit of plaintiffs' petition for counsel fees on the merits, and (b) costs and expenses in the amount of $181.98.

---

Subsequent computations in this opinion are based on this assumption.

**16.** It is to be noted that the errors in plaintiffs' papers were not perceived—or, at all events, brought to the court's attention—by defendant.