Luisa A. DE ABADIA, et al.,
Plaintiffs, Appellees,

v.

Hon. Luis IZQUIERDO MORA, et al.,
Defendants, Appellants.

Nos. 85–1505, 85–1520.

United States Court of Appeals,
First Circuit.

Argued Sept. 13, 1985.

Decided May 27, 1986.

Rehearing and Rehearing En Banc
Denied June 27, 1986.

Marcos A. Ramirez Lavandera with whom Marcos A. Ramirez and Ramirez & Ramirez, Hato Rey, P.R., were on brief, for defendants, appellants.

Jose E. Fernandez-Sein with whom Law Offices of Nachman & Fernandez-Sein, Santurce, P.R., was on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, and ALDRICH and TORRUELLA, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

This is our second installment in a saga of Puerto Rican politics following the gubernatorial election of November 1984. *See Jimenez-Fuentes v. Torres Gaztambide,* 779 F.2d 765 (1st Cir.1985) (since withdrawn and decision en banc now awaited). Plaintiff Luisa de Abadia, a member of the party (PNP) ousted in that election and former Executive Director of the Quality Control Program of the Department of Health, seeks monetary damages and injunctive relief under 42 U.S.C. § 1983 against Luis A. Izquierdo Mora, the recently appointed Secretary of the Department of Health, Guillermo Irizarry, the Administrator of the Department, and Sonia I. Colon Robles, the Department's Personnel Director. She alleges that defendants violated her civil rights when they demoted her to a "career" position as a nutritionist within the Department. Specifically, she claims her demotion was due to her political affiliation, in violation of the strictures of *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Defendants moved for summary judgment, arguing that the qualified immunity to which, as public officials, they were entitled, see *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), precluded recovery in damages against them, whatever the outcome of the injunctive claim. The district court denied the motion, and defendants appeal.

Strictly, defendants filed two motions. The court disposed first of their motion to delay discovery until the motion for summary judgment was acted upon. In denying this, by written order, the court said that although it might agree that officials might be entitled to a qualified immunity in claims for damages in a proper case,

"this action is ... not an action seeking damages, but is also an action for injunctive relief against which the defendants may not be entitled to a claim of qualified immunity. Generally, the immunity doctrine is only applicable to actions for damages and cannot be employed in suits seeking declaratory or injunctive relief. *Mitchum v. Foster,* 407 U.S. 225 [92 S.Ct. 2151, 32 L.Ed.2d 705]. Thus, the issue of immunity is not as clear cut as defendants argue in their motion to stay."

Our thought that the court was here confusing the making of an early ruling as to immunity with the right to an immediate appeal, where both damages and an injunction were involved, is confirmed by its later, oral, ruling denying the motion for summary judgment. When the parties discussed the merits of that motion, and the court stated it would deny it, it added, "It is not appealable, anyway." The following then occurred.

Mr. Ramirez: It is appealable if it denies qualified immunity, that's one of the cases we cited on the motion.

The Court: I am not denying qualified immunity, I am denying your motion for summary judgment, two different things.

Mr. Ramirez: It includes qualified immunity.

The Court: You raised it, but in an injunction I am not so sure that qualified immunity applies or not, as I said in my order denying your request to stay.

Mr. Ramirez: Okay so Your Honor is denying then the—

The Court: I am denying your motion for summary judgment, I believe that there is a controversy of fact that cannot be resolved through summary judgment.

This would seem to raise two points: whether it was correct to deny the motion for summary judgment, and whether an incorrect denial would be appealable.[1]

We consider first whether denial of summary judgment on a claim of qualified immunity which the Court held in *Mitchell v. Forsyth,* —— U.S. ——, 105 S.Ct. 2806, 86

---

1. Conceivably there is a further question whether the court misspoke itself in the second paragraph. Qualified immunity is, of course, no defense to equitable relief. That is the cause of our problem.

L.Ed.2d 411 (1985), warranted an immediate appeal as a "final decision" in an action simply for damages, would not permit an immediate appeal if there were also a claim for injunctive relief. This question was left open in *Mitchell,* ante, at 2812, footnote 5. Before *Mitchell,* two circuits had divided on this question. The Fourth, *Bever v. Gilbertson,* 724 F.2d 1083 (4th Cir. 1984) (2–1), denied appealability; *Tubbesing v. Arnold,* 742 F.2d 401 (8th Cir.1984), held contra. We have found no other cases since *Mitchell,* and it is a matter of first impression in this circuit. In *Krohn v. United States,* 742 F.2d 24 (1st Cir.1984), we held that the denial of qualified immunity is immediately appealable, but, as in *Mitchell,* ante, we had before us only a claim for damages. It seems to us, however, that the official's concerns are the same when there is also a claim for an injunction and we conclude that the rule should extend to such cases.

As the Court said in *Mitchell,* qualified immunity is more than an immunity from money damages; it is "an *immunity from suit* ... [which] is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 2816 (emphasis in original). This is so, the Court said, because,

> the "consequences" with which we were concerned in *Harlow* are not limited to liability for money damages; they also include "the general costs of subjecting officials to the risks of trial—distraction of officials from their official duties, inhibition of discretionary action, and deterrence of able people from government service." *Id.* at 2815 (quoting *Harlow,* ante, 457 U.S. at 816, 102 S.Ct. at 2737).

Plaintiff argues that because defendants must proceed to trial in any event on the injunctive claim, there is little purpose in allowing them to avoid trial on damages. Plaintiff would quote *Bever,* ante, 724 F.2d at 1086–87, to the effect that,

[defendants remain] the principal defenders of the state's position. They will bear a major responsibility for the outcome of the litigation and will be among the principal witnesses at trial. Whether or not they are immune from damages against them in their individual capacities, the litigation will demand their time and attention. A present declaration of immunity from damages claims cannot avoid the diversion of their attention from official duties which the litigation will occasion.

. . . .

In these circumstances, the question whether a denial of the immunity claims is appealable would appear to have little effect upon the willingness of responsible persons to serve in public office.[2]

With due respect to the Fourth Circuit, we do not follow its reasoning. Its approach assumes that, for a public official, the threat of suit in his individual capacity is no worse than the threat of suit as representative of the state, and that the burdens of defending are no more onerous for the former than the latter. Although we recognize a public official's obligation to defend a suit brought against him in his public capacity, the emotional, and perhaps physical, responsibility is not as great. "[T]he fear of being sued and held personally liable for damages is a far cry from a suit for reinstatement or injunctive relief, which public officials face regularly in the course of performing their duties." *Bever,* ante, 724 F.2d at 1091–92 n. 4 (Hall, J., dissenting). The threat may well include punitive, as well as actual damages. *See Carlson v. Green,* 446 U.S. 14, 22, 100 S.Ct. 1468, 1473–74, 64 L.Ed.2d 15 (1980). Even if the actual time spent on the case away from his ordinary responsibilities were the same whether the damages claim was in or out, the official's energy may be

---

**2.** The Fourth Circuit suggested that the interest in prompt results also militates against allowing these appeals: "[Defendants] might have obtained a favorable judgment on the claims against them individually sooner by a trial on the merits than by appellate litigation of their

immunity claims." *Id.* at 1087. This is a red herring, totally irrelevant to the overriding concern, expressed in *Harlow* and *Mitchell,* for the official's right to avoid trial, and not merely to obtain an expeditious resolution of his immunity defense.

diverted from pressing public issues merely by the personal apprehension involved. At the least, the official sued for damages may have to retain his own counsel at his own expense. *Tubbesing*, ante, 742 F.2d at 404 n. 3. In this litigious age all of these concerns are legitimate, and might easily deter individuals from taking public office.

Finally, the Fourth Circuit's approach might invite plaintiffs to include spurious injunctive claims to avoid interlocutory appeal of the immunity question, and thus force the defendant to face the tribulations of a trial from which he may be properly immune.

In sum, we agree with the dissent in *Bever*, and with *Tubbesing* in all respects. We hold that an interlocutory appeal lies from the district court's denial of summary judgment on a claim of qualified immunity from damages liability, even though a petition for injunctive relief is also pending.

Perhaps because of its erroneous views on the availability of an advance ruling on qualified immunity, the district court did not discuss whether defendants had made a sufficient showing of immunity. Instead, it denied summary judgment on the basis of "clear issues of fact," but made little showing as to their extent beyond reference to the "controversy whether Mrs. Abadia was or was not a confidential employee, what her duties were ... [t]hat's why I cannot decide by summary judgment." Obviously if there was a determining question of fact regarding defendant's qualified immunity defense, denial of the motion was correct. *See Fernandez v. Leonard*, 784 F.2d 1209, 1214, note 2 (1st Cir.1986).

There is a serious shortage of record. In their proposed pretrial order, the parties listed four disputed matters: 1) whether plaintiff's position was "confidential"; 2) whether she was terminated for political reasons; 3) whether her position was "policy making"; and 4) whether "political loyalty is an appropriate requirement for the performance of the office." Not all of these, however, are factual disputes upon which a determination of this motion for summary judgment depends.

■ To start with Nos. 1 and 3, *Branti* makes it clear that these classifications do not, per se, excuse political demotions.[3] In *Branti*, the Court pointed out that labels such as "policymaking" or "confidential" are not what controls; rather, the relevant inquiry is whether "party affiliation is an appropriate requirement for the effective performance of the public office." 445 U.S. 507 at 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574. Thus, issue Nos. 1 and 3 really merge into, and are not separate from, issue No. 4. At the same time, issue No. 2 does not have to be decided in defendants' favor if they can succeed on No. 4. Furthermore, with respect to the plaintiff's claim for damages, defendants need not win on the merits of issue No. 4 if they are entitled to the defense of qualified immunity. If the defendants make a sufficient showing of objective good faith, *viz.*, that at the time of the demotion the law was not "clearly established" against their action, they are immune from suit. *Harlow*, ante, 457 U.S. at 818, 102 S.Ct. at 2738.

The first question is what is meant by "clearly established." We consider it to be something less than requiring the public official to show that the principle of law did not exist, or there would be little left; there would be few cases on which officials could succeed. Only rarely do legislatures or courts introduce or change whole principles. More often, the process of change involves a sharpening of lines in the law's grey areas, absent which there could reasonably be excusable mistakes. The case law supports this broad interpretation. *See Harlow*, ante, 457 U.S. at 815–19, 102 S.Ct. at 2736–39; *Procunier v. Navarette*, 434 U.S. 555, 560–65, 98 S.Ct. 855, 859–61, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 315–22, 95 S.Ct. 992, 997–

---

**3.** With respect to issue No. 1, it is not apparent how it could be thought that plaintiff was other than a "confidential employee" as defined in the Puerto Rico Personnel Law. *See* P.R.Laws Ann. tit. 3, § 1350 (1978 & Supp.1984).

1001, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 240–48, 94 S.Ct. 1683, 1688–92, 40 L.Ed.2d 90 (1974). In each of these cases, the Court laid heavy emphasis on the officials' good faith, now defined by *Harlow* as objective good faith,[4] as the criterion by which their actions are to be judged.

> [T]he public interest requires decision and action.... Public officials ... who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity ... is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error than not to decide or act at all. *Scheuer,* ante, 416 U.S. at 241–42, 94 S.Ct. at 1689.

The good faith standard is the Court's attempt to accommodate this need for discretionary action in areas of uncertainty with the protection of individual rights. "The official cannot be expected to predict the future course of constitutional law, but he will not be shielded from liability if he acts 'with such disregard of ... clearly established rights that his action cannot reasonably be characterized as being in good faith.'" *Procunier,* ante, 434 U.S. at 562, 98 S.Ct. at 860, (quoting *Wood,* ante, 420 U.S. at 322, 95 S.Ct. at 1001) (citations omitted). These are concerns that apply just as forcefully to refinements or clarifications of existing doctrine as to radical changes of direction. The cases are also clear that the limits of good faith vary with "the scope of discretion and responsibilities of the office and all the circumstances as they appeared at the time of the action." *Scheuer,* ante, 416 U.S. at 247, 94 S.Ct. at 1692. Where, as in this case, the official's responsibilities are broad, he must be afforded a correspondingly broad range of discretion. While employment decisions may not appear initially to be the type of critical actions for which wide discretion is appropriate, at least at the higher levels, they are essential to the effective implementation of important government policies. *See Elrod,* ante, 427 U.S. at 367, 372, 96 S.Ct. at 2686–87, 2689.

On this basis, the question becomes, not whether defendants were in fact correct in believing party affiliation to be an appropriate requirement for plaintiff's position, but whether, viewed objectively, they were reasonable in so believing. If this were an issue of subjective good faith, there might always be a question of fact; it is difficult to think there could ever be summary judgment. However, in the case of objective good faith, that a reasonable man in defendants' position could have believed his conduct to be warranted, *Malley v. Briggs,* — U.S. ——, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986), may be a purely legal question, *Mitchell* at 2816–17 n. 9, so that it may be possible for an appellate court to rule that a defendant was reasonable as a matter of law. In that event, no purpose would be served by remanding to the district court. We believe this is such a case.

We start with the fact that *Elrod* and *Branti* marked a substantial change in the law. That "party affiliation be an appropriate job requirement" is much easier to say than to apply to the wide number of factual situations bound to occur in any government employing a large number of individuals. In the present state of the law, whatever may be the ultimate resolution on the merits—an issue not before us—of a particular case, may frequently not be easy to say in advance. Certainly at the top there must be political as well as other guidelines for the conduct of the Commonwealth's Department of Health. Plaintiff, in accordance with governmental regulations, had executed her own official job description as Executive Director of the Department of Health. Plaintiff's own re-

---

**4.** *Harlow* is only the most recent pronouncement on qualified immunity. The doctrine has roots that antedate all of these cases, which simply developed its contours. *Harlow*'s signif-icance lies in its rejection of the subjective good faith prong of the doctrine. 457 U.S. at 817–18, 102 S.Ct. at 2737–38.

sponsibilities appear to mesh directly therein.[5] With these compare *Branti,* 445 U.S. at 518, 100 S.Ct. at 1294–95.

> [I]t is ... clear that the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments.

Plaintiff's affidavit that her true employment was mundane, only, *non constat* that she had prepared a quite different job description, ante, on the asserted basis of her actual performance,[6] might create an issue of fact ultimately on the merits, but to permit a proffer of an oral contradiction of her own signed description to create an issue of fact destroying defendants' qualified immunity would emasculate the entire principle. No official would be free of suit.

■ We would add that an official should have at least a qualified right to regard an office as embracing the characteristics normal to its nature. If, in fact, the preceding governor withheld the duties embraced in plaintiff's job description this should not foreclose his successor from naming a replacement with the higher duties. As the court said in *Meeks v. Grimes,* 779 F.2d 417, 419 n. 1 (7th Cir. 1985),

> [The] focus is on the "inherent powers" of the office, not what any individual officeholder actually does.

> > *Elrod* and *Branti* require examination of the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office. *Ness v. Marshall,* 660 F.2d 517, 522 (3d Cir.1981); *Alfaro de Quevedo v. De Jesus Schuck,* 556 F.2d

591, 593 n. 4 (1st Cir.1977); *Mummau v. Ranck,* 531 F.Supp. 402, 405 (E.D. Pa.1982), *aff'd,* 687 F.2d 9, 10 (3d Cir. 1982). Thus, if an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance. In this court's reiteration of the *Branti* formulation, we emphasized the functions of the office involved, not the officeholder: "The test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decision making on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). The unarticulated purpose behind this approach seems to be two-fold: first, to resolve the issue entirely in one proceeding, thereby relieving the courts of the burden of having to reexamine a certain position every time a new administration changes the mix of responsibilities bestowed upon the officeholder; and, second, to provide certainty to litigants.

*Tomczak v. City of Chicago,* 765 F.2d 633, 640–41 (7th Cir.1985). Therefore barring some radical transformation that goes to the core of the nature of the position, the district court need not concern itself with what past or present administrations have done with the office.

---

**5.** *See, e.g.,*

"2. Advise the Secretary, Governors' Aids, and Legislators in the establishment of the philosophy, public policy, goals and objectives related to the health services.

"7. Recommend drafts of bills and bills directed to implement, amend or derogate provisions allowing for the development of the functions assigned to the Program; discuss

them; process for the consideration of the Secretary, the Governor or the Legislature and give follow up to determine the action taken."

**6.** "Detail the work you perform in the order of importance of the different tasks, starting with the most important...."

■ Indeed, to labor the point, the very fact that there is a reasonable dispute means that, from the standpoint of qualified immunity, the law was not clearly established in plaintiff's favor. In *Tubbesing v. Arnold* a section 1983 discharge action depended upon the meaning of a "personnel policy manual." In granting defendants qualified immunity the court said, 742 F.2d at 406,

> Insofar as there is a disputed issue concerning the Manual, it involves the differing interpretations of Tubbesing and the Board. There is no dispute that the manual was in effect and no dispute about the contents of the Manual. The only question involves its interpretation, and this is a question for the court. Rather than precluding summary judgment, the fact that the application of the Policy Manual [to the directors] is disputed merely emphasizes that the law at the time of the conduct complained of was not clearly established. Even considering the evidence in the light most favorable to Tubbesing, and giving her the benefit of all reasonable inferences, we cannot conclude that there is a genuine issue of fact concerning whether Tubbesing had a "clearly established" right to continued employment.

So viewed we consider that, as a matter of law, defendants could reasonably believe, although on the merits they may ultimately prove to be mistaken, that the position of Executive Director of the Quality Control Program was one that allowed substantial responsibility for the development and implementation of high level policy as detailed in the job description, n. 3 ante, requiring a political outlook compatible with the Secretary's; in short, that it was a position for which political affiliation was an appropriate requirement. Particularly it should not lie in plaintiff's mouth, on the issue of defendants' good faith, to say that they could not regard the job as being what she herself had described it to be. (See n. 5, ante.)

In sum, we are presently concerned not with the correctness of defendants' determination, on the one hand, nor their subjective state of mind on the other, but of the "objective reasonableness" of their conduct. *See Floyd v. Farrell*, 765 F.2d 1, 4 & n. 1 (1st Cir.1985). We cannot say that the incorrectness of their conduct was clearly established. *Harlow* demands not prescience, but objective good faith. In some cases the application, vel non, of *Elrod-Branti* may be clear; in others it will be sufficiently fraught with uncertainty that an official could not be faulted for failing to apprehend.

We are not without sympathy for district judges who would like full guidance in this difficult area, but we must hesitate to write a textbook providing resolution of all future questions. For now we merely hold, finding appellants to be at least reasonable in believing the law was not clearly established, that they are entitled to qualified immunity from suit. We therefore vacate and remand with directions to grant summary judgment on the issue of personal liability and to dismiss the counts as to defendants' personal damages.*

LEVIN H. CAMPBELL, Chief Judge (concurring).

I fully join in Judge Aldrich's opinion for the court.

Because of Judge Torruella's extensive dissent, reflecting his view that there is a triable issue of fact underlying the claim of qualified immunity, I think it may be useful to recall what movants (the defendants) were required to establish in order to obtain summary judgment, and to restate what the respective parties in fact presented.

As moving parties for summary judgment, defendants had the burden of show-

---

* Our dissenting brother's reference to plaintiff's separate count for damages under the Commonwealth statute, for which pendent jurisdiction is asserted, is to a matter not presently before us. However, the writer of this opinion, the matter having been raised, would call the district court's attention to *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67.

ing the absence of a factual dispute over material issues relative to their defense of qualified immunity. Hence, the moving papers were required to substantiate the absence of a material issue of disputed fact over whether, at the time they demoted plaintiff, defendants could reasonably have believed that the law was not clearly established against their actions.

In support of their motion, defendants submitted a certified copy of so-called classification questionnaire signed by plaintiff and the Secretary of Health. They asserted that there was no genuine issue of material fact that plaintiff's functions and duties were those listed in that document.

Plaintiff filed an opposition to the motion. She did not dispute that the certified document presented by defendants correctly portrayed the official job description pertaining to plaintiff's position, but she argued strenuously that it did "not state or show that party affiliation is an appropriate requirement for the effective performance of th[e] position." She also cited to a number of other documents that had already been made a part of the record, in particular to affidavits from two of the plaintiff's predecessors-in-office and the former Secretary of Health averring that (1) while in office, plaintiff's predecessors did not formulate public policy or implement the politics of any given political party; (2) politics was not a factor in the discharge of their functions; and (3) they were not members of the same political party as the then-Secretary of Health. Plaintiff further referred to the affidavits filed by defendants Izquierdo-Mora and Irizarry, and argued that neither one of these affidavits contained "any statement to the effect that de Abadia's position was a policy making position or that party affiliation [was] an appropriate requirement for the effective performance of the position."

Notwithstanding the foregoing opposition, I believe that defendants succeeded in showing there was no *material* issue of disputed fact that would preclude an award of summary judgment for defendants *on the limited question of qualified immunity,* because (1) even assuming that the averments of her predecessors and the former Secretary of Health would be relevant to a merits inquiry, a reasonable person (as Judge Aldrich's opinion for the court shows) could have disregarded these matters in assessing what the "inherent powers" of her office were; and (2) plaintiff implicitly concedes that the job description submitted by defendants with their motion reflects the official duties of her office, though contending that *as a matter of law* such duties do not make party affiliation an appropriate prerequisite for the job.

Whether, as a matter of law, these duties do or do not make party affiliation an appropriate prerequisite for the job, seems to me to be a close and difficult question. Although the law seems clear at either end of the *Elrod-Branti* spectrum, not enough precedent dealing with various upper-level governmental positions in the middle of the spectrum has yet emerged to enable one to easily classify such a position. *See Ness v. Marshall,* 660 F.2d 517, 520 (3d Cir.1981) ("Guidance from the Supreme Court as to when party affiliation may be 'appropriate' is limited to the facts of the *Branti* case and to a few examples offered by Justice Stevens in his *Branti* majority opinion."). Subtle distinctions must be drawn in determining whether a position that occupies this troublesome middle tier falls within the *Elrod-Branti* exception to the first amendment prohibition against political firings.[1] Not only is there a dearth of post-*Branti* First Circuit authority in this area, but cases from other circuits assessing the merits of political discharge claims brought by upper-level governmental employees have generally found the job to be such

---

1. *See, e.g., Ecker v. Cohalan,* 542 F.Supp. 896, 901 (E.D.N.Y.1982) (Weinstein, C.J.) ("Among the indicia that locate a job along the spectrum between policymaker and clerk are: relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials and responsiveness to partisan politics and political leaders.").

that party affiliation was a permissible consideration.[2]

For these reasons, I think defendants could reasonably have believed that the federal law was not clearly established against their actions. While the Puerto Rican courts had indeed issued their own opinions, based mainly on the Commonwealth's Constitution and laws, the matter before us turns on federal law and, here, I am considerably less clear than is my colleague, Judge Torruella, as to how that law affects offices like this. Our own court is holding an en banc hearing in respect to two recent employment demotion/discharge cases simply because of our own concern over how the United States Supreme Court decisions are meant to be applied. Since the only question before us is what a reasonable person would have known as to the state of the law, and not what the actual answer is in this case, I agree with Judge Aldrich that defendants should be immune from damages by virtue of their qualified official immunity, whatever the eventual outcome of plaintiff's claim for restoration of her job with back pay. And I emphasize, what Judge Aldrich has said, that the immunity issue is not whether these defendants were subjectively reasonable in their opinion; it is enough that, on the record, their opinion could be found to be objectively reasonable.

TORRUELLA, Circuit Judge (dissenting).

This appeal presents two separate issues: (1) whether this court has jurisdiction to entertain this appeal, and if it does, (2) whether appellants are entitled to qualified immunity from suit. Because I cannot in good conscience agree that this court has either appellate jurisdiction over this controversy, or that appellants have a valid claim to immunity, I respectfully dissent.

### I. Appealability

The issues presented by the appealability question are twofold. The first is raised by reason of the *nature of the action* taken by the district court, which was a denial of a summary judgment motion on the ground that a genuine dispute existed over a material issue of fact. For reasons set forth more fully below, I do not believe the district court's decision was a "conclusive," and hence, appealable decision. Moreover, I believe that the majority, contrary to the rules governing summary judgment, draws factual inferences in favor of the *moving* party, rather than to the benefit of the party opposing the motion. In short, I believe the majority improperly disregards the factual dispute below, and in a usurpation of the functions of the trial court and jury, decides both legal merits that were not addressed below, and resolves contested factual matters that, under the rules governing summary judgment, should be left to decision by the fact finder, and not by this appellate tribunal.

The second issue that precludes appellate jurisdiction is the *nature of the issues* raised in the court below; namely, a joint claim for monetary damages and equitable relief. The majority decides that, while trial will continue as to equitable relief, an interlocutory appeal can be allowed on qualified immunity as to damages. For reasons more fully set forth below, I do not share the majority's willingness to depart

---

**2.** *See, e.g., Tomczak v. City of Chicago,* 765 F.2d 633 (7th Cir.) (party affiliation was an appropriate prerequisite for position of First Deputy Commissioner of the Department of Water for the City of Chicago), *cert. denied,* — U.S. —, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985); *Shakman v. Democratic Organization of Cook County,* 722 F.2d 1307, 1310 (7th Cir.) (per curiam) (party affiliation was an appropriate prerequisite for position of Superintendent of Employment for the Chicago Park District), *cert. denied,* 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983); *Mummau v. Ranck,* 687 F.2d 9 (3d Cir.1982) (per

curiam) (party affiliation was an appropriate prerequisite for position of Assistant District Attorney). In this connection, it is significant that, with the exception of the Supreme Court's decisions in *Elrod* and *Branti,* the only cases which plaintiff cites in support of her argument that, at the time of her demotion, federal law was "clearly established" against the defendants' right to demote her are two decisions of the Puerto Rico Supreme Court, only one of which expressly purports to be based on a construction of federal as well as of Puerto Rico law.

from the strong judicial policy against interlocutory appeals. Accordingly, as with the nature of the action taken by the district court, I believe the nature of the issue presented also precludes appellate jurisdiction.

### A. *The nature of the action taken by the district court*

At the risk of being pedantic, I should commence by restating the general rule of federal appellate jurisdiction, one which at times seems honored more in breach than in compliance, limiting that "jurisdiction [to] appeals from final decisions of the district courts." 28 U.S.C. § 1291. This provision manifests "a firm congressional policy against interlocutory or 'piecemeal' appeals," *Abney v. United States,* 431 U.S. 651, 656, 97 S.Ct. 2034, 2038, 52 L.Ed.2d 651 (1977), and "is the dominant rule in federal appellate practice." *Flanagan v. United States,* 465 U.S. 259, 104 S.Ct. 1051, 1057, 79 L.Ed.2d 288 (1984). It follows from this rule, that for an interlocutory decision to be appealable, the district court must render a ruling which "conclusively determine[s] the disputed question." *Mitchell v. Forsyth,* — U.S. —, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985); *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2457–2458, 57 L.Ed.2d 351 (1978). Thus, the question appealed from must involve a classical Rule 56 *issue of law,* in which there are no material questions of fact which are disputed. *Mitchell v. Forsyth, supra.* To belabor the obvious, it follows that summary judgment cannot be granted where there are material questions of fact in dispute.

The first ground for our lack of appellate jurisdiction in this case is that, by virtue of the nature of the action taken by the trial court, it failed to make a "conclusive" determination. The district court did not rule on the *merits* of the qualified immunity question but rather decided that it could not so rule because there were contested material questions of *fact.* The following

dialogue took place between the district judge and appellant/defendant's counsel:

Tr. 7 THE COURT: I think that there are clear issues of fact here which must be resolved, whether by the Court or by the Jury.

It is not completely without controversy whether Mrs. Abadia was or was not a confidential employee, what her duties were.

．　．　．　．　．

Tr. 8 RAMIREZ: . . .

The point is what are the duties of the position, and that is clear from the documents that we presented in support of our motion, and that simply cannot be controverted.

．　．　．　．　．

Tr. 9 THE COURT: She has controverted them, as I understand it, that's why I cannot decide by summary judgment.

．　．　．　．　．

Tr. 11 THE COURT: I am not denying qualified immunity, I am denying your motion for summary judgment, two different things.

．　．　．　．　．

THE COURT: I am denying your motion for summary judgment, I believe that there is a controversy of fact that cannot be resolved through summary judgment.

Transcript of June 21, 1985 hearing.

If the district court was incorrect, and there were no material issues of fact pending, the proper outcome on appeal would be for this court to remand with instructions that the trial court decide the issues of law in the first instance. *Harlow v. Fitzgerald,* 457 U.S. 800, 819–820, 102 S.Ct. 2727, 2738–2739, 73 L.Ed.2d 396 (1982); *see also Witters v. Wash. Dept. of Services For Blind,* — U.S. —, —–—— n. 3, — n. 5, 106 S.Ct. 748, 751 n. 3, 753 n. 5, 88 L.Ed.2d 846 (1986). Yet despite a recognition by the majority that "the district court did not discuss the merits of [the qualified immunity] issue" (opinion at p. 1190) and

that "[t]here is a serious shortage of record," (*id.*) it nevertheless proceeds to take the unusual appellate step of deciding issues not ruled upon by the district court in the first instance. *Witters, supra.* As noted above, it is a fundamental precept of appellate procedure that prior to appellate review, the district court must conclusively *decide* the issue below. *Id.* Since, as revealed by the above-cited colloquy, the district court did *not* decide the qualified immunity merits below, the majority has acted where no appellate jurisdiction exists. Such *de novo* appellate adjudication of the merits, in my view, amounts to nothing less than our usurpation of the trial court's role. With this opinion, we have now become a court of first instance. And with such a result, I simply cannot concur.

The majority's error is further compounded, in my view, by its disregard of the material factual dispute below (as recognized by the district court in denying summary judgment). To understand the nature of this factual dispute, and why the district court correctly regarded such dispute as precluding a ruling on the merits, it is necessary to examine the motion for summary judgment itself.

Appellant/defendants' motion for summary judgment claimed two grounds for appellee/plaintiff's *dismissal:* [1] (1) that her policymaking duties and functions required political loyalty as an appropriate requirement for performance of her work; and (2) that she was a confidential employee subject to removal at will under the laws of Puerto Rico. The motion was unaccompanied by any affidavits, but rather by a certification from the sub-director of the Commonwealth's personnel office attesting to the validity of the job description, which was attached. The job description,[2] is on a printed government form (AP–16, Model 7/78), the contents of which are filled in by

typewriter. Appellee's signature appears on the last page of the multi-paged document. Contrary to the majority's conclusion, there is no explanation of or evidence as to authorship of this document, apart from the fact that plaintiff's signature appears at the end and that questions on the form appear to be directed to an employee filling it in.

If, as the majority concludes, authorship is a material fact, basic rules of summary judgment require that defendant-movant affirmatively plead (and establish) authorship as not in dispute. *See Mack v. Cape Elizabeth School Board,* 553 F.2d 720, 722 (1st Cir.1977). Defendant-movant below, however, has made no such pleading, much less a showing. Nevertheless, according to the majority, even though authorship was not affirmatively alleged, the *inference* is apparently supposed to speak for itself.

The problem with the majority's adoption of the above inference is twofold. First, the inference is by no means a foregone conclusion. From the nature of the "personnelese" language used, it is entirely possible that the job description was prepared by the personnel office, with plaintiff's signature being a mere formality. Second, if inferences are to be drawn, the rules governing summary judgment are clear. Inferences are to be drawn *against* the movant, and in favor of the party opposing the motion. *See Harlow v. Fitzgerald, supra* 457 U.S. at 816 n. 26, 102 S.Ct. at 2737 n. 26 (1982).

Thus, plaintiff's authorship is not only a critical factual premise, but it requires a critical inference by the majority opinion. This means, in effect, that in the face of ambiguous evidence, the majority has not only drawn inferences, but resolved them in favor of defendant-movant below. In my view, such a result not only verges on improper factfinding by an appellate tribu-

---

1. Defendants first claimed only a "demotion" had taken place, but, on appeal, counsel for defendant refers throughout (*ex., see* page 2, paragraph 2 of appellant's brief) to the personnel action as a dismissal, an interesting Freudian slip, which I agree, more accurately reflects what actually occurred.

2. As will be discussed, *post,* the translation relied upon by the majority, as to ¶ 2 of the description, is incorrect.

nal, but it directly contravenes the rules governing summary judgment. *Id.* Accordingly, given the state of the pleadings, I cannot agree with the majority that authorship is beyond dispute.

Apart from authorship, the second factual dispute ignored by the majority relates to the powers of plaintiff's position and whether, given these powers, political affiliation was an appropriate requirement.[3] Appellee/plaintiff's opposition to the motion for summary judgment contends that "[t]he question as to whether or not the position held by de Abadia requires a particular party affiliation for its effective performance, is a question of fact" (¶ 4, Opposition to Motion for Summary Judgment). The opposition was supplemented by the affidavits of Dr. Victor González and Mrs. Carmen Vega-de la Rosa, prior incumbents to the position in question, *but who nevertheless were members of the P.D.P. during successive P.N.P. administrations.* They attested to facts establishing that the position in question was not one which formulated public policy or for which membership in a political party was appropriate.[4]

Under normal circumstances, it would appear that the affidavits of plaintiff's predecessors, when compared to the job description offered by defendant, present a dispute as to what the job is about.[5] The majority, however, regards the affidavits of plaintiff's predecessors as *not* creating an issue of fact. In short, the majority states that the relevant inquiry, as a matter of law, is not plaintiff's *actual* tasks but the "inherent powers" of the position. *Ante,* at p. 1192, citing *Meeks v. Grimes,* 779 F.2d 417, 419 n. 1 (7th Cir.1985). Thus, because the affidavits of plaintiff and her predecessors allegedly address the actual duties of the position, the factual dispute generated is, in the majority's view, legally irrelevant.

I do not see the line between actual duties and inherent powers as indelible. Moreover, to the extent the majority today announces an inquiry that forecloses consideration of actual duties, even as evidence of inherent powers, I cannot agree to it. First, as a matter of law, judicial reliance on job descriptions as irrebuttable statements of inherent powers has occurred only in the context of *statutory* job descriptions, which is not the case before us. *See Ness v. Marshall,* 660 F.2d 517, 521–522 (duties of plaintiffs enumerated in city's administrative code); *Mummau v. Ranck,* 531 F.Supp. 402, 405 (E.D.Pa.1982), *aff'd,* 687 F.2d 9, 10 (3d Cir.1982) (same). Second, as a matter of policy, I believe that where we do *not* have a statutory job description, today's rule of *per se* veracity for job descriptions "on file" is, to say the least, a dangerous one, especially where, as here, *no reliance* on that job description has been pleaded or shown by defendants. *See* discussion *post,* pp. 1192–1193; *see also Meeks v. Grimes,* 779 F.2d 417, 420 n. 2, 423–424 (7th Cir.1985) (remand to district court because of insufficient and conflicting record on the "nature of the [employee's] duties," and because inherent powers is an issue for the trier of fact); *Alfaro de Quevedo v. De Jesús Schuck,* 556 F.2d 591, 593 n. 4 (1st Cir.1977) (nondispute over inherent powers premised on district court findings of fact, and job description *not* disputed or contested by plaintiff); *Tubbesing v. Arnold,* 742 F.2d 401, 406 (8th Cir.

---

**3.** The latter question here—whether given the powers, political affiliation is appropriate—is of course one of law. However, its critical underpinning is the *nature* of the powers, a *factual* issue that determines the legal one.

**4.** This is also supported by the affidavit of the Secretary of Health during Dr. González and Mrs. de la Rosa's incumbency.

**5.** The majority indicates that "the very fact that there is a reasonable dispute means that, from the standpoint of qualified immunity, the *law*

was not clearly established in plaintiff's favor." *See* opinion at pp. 1192–1193 (emphasis supplied). This however, as will be explained, misconstrues both *Harlow* and the issues presented. The dispute *here* is as to plaintiff's "inherent" duties, clearly a *factual* issue which cannot be decided under Rule 56 in view of the conflicting evidence. These factual issues have nothing to do with whether the *law* applicable to those facts is clearly established, which will be presently discussed.

1984) (no dispute regarding veracity of job description contents).

Even accepting that the proper inquiry is not actual tasks but "inherent powers," I still see a factual dispute as to the latter in the record. Under Rule 56, if the inherent powers of plaintiff's position are a material fact (as the majority concludes), defendant-movant below would have the burden of showing an *absence* of dispute as to that fact. *Mack v. Cape Elizabeth School Board, supra.* Given that defendant has made no such showing, his motion should fail, especially where the requirement of drawing inferences in the *non*-moving party's favor reveals great ambiguity as to the actual inherent powers.

An examination of defendant-movant's pleadings on the inherent powers issue only reveals a statement that political affiliation was appropriate, and an argument by counsel that the attached job description represents the inherent powers. No affidavit is provided (not even that of defendant Secretary) attesting to the critical factual issue of whether the job description accurately represents the inherent powers. Thus, if it is accepted, as the law requires, that inferences as to authorship and inherent powers must be resolved against defendant-movant, what is left is not a document authored by plaintiff but an allegation by defendant, never shown to be an uncontested factual dispute, that the job description indisput-

ably represents the "inherent powers" of the office.[6]

Plaintiff's opposition to the motion, however, reveals quite contrary assertions as to inherent powers. As noted above, the affidavits of plaintiff's predecessors, *who served under opposite-party superiors*, stated that the job was such that political affiliation was *not* an appropriate requirement.[7] Given the requirement of drawing inferences in the non-moving party's favor, sworn statements as to what a job is about, especially over time, inevitably speak to the issue of inherent powers. If nothing else, the inference is overwhelming that the affidavits of these disinterested predecessors, when compared to a job description of unclarified origin, create grave doubt as to any nondispute over the issue of inherent powers. So viewed—and the doubt is only exacerbated by the lack of showings by the moving party on the issue—it is a very bold appellate step for this court to view the facts as conclusive.

A third material fact relevant to the majority's conclusion is defendant-movant's alleged *reliance* on the job description form as a basis of the discharge. In short, the holding today appears to be that, looking at the face value of the allegedly undisputed job description, defendant's action (reliance on the job description), objectively viewed,

**6.** The lack of a showing by defendant is most unsettling because of the ease with which such a statement could have been included in defendant's affidavit. In other words, it follows from the arguments of defendant's counsel that defendant was entitled to rely on the accuracy of the job description and place his people in positions that, regardless of prior *actual* duties, had the *potential* of being high-level policy posts. If defendant indeed so relied on the accuracy of the job description, then I cannot see why defendant's affidavit was silent on the point, unless perhaps such reliance simply could not be asserted in good faith.

**7.** I would like to stress that the disinterested nature of these affidavits—i.e., that the predecessors were *not* of plaintiff's party, and that the predecessors served under opposite-party superiors—very substantially affects my dissent. In short, I agree with the majority that we must be wary of plaintiff's who, through spurious or

suspect factual allegations, oppose summary judgment. But neither can we absolve defendants, who move for summary judgment, from establishing the facts material to their legal conclusions.

Thus, the problem in this case, apart from the authorship issue, is that affidavits by members of the opposite party are not of a spurious or self-serving nature. So, even if we regard the issue as inherent powers, I think the sworn testimony of these "seasoned" predecessors speaks to it. More importantly, they speak to the issue of whether political affiliation has historically been an appropriate requirement for the job, an admittedly legal conclusion but one based on very material facts. Thus, given *Branti*, where the appropriateness of political affiliation is the relevant inquiry, I cannot see how, under the pleadings as they stand, the nature of the job (whether inherent or actual) is not in dispute.

was reasonable and/or not a violation of clearly established rights.

The problem with the majority's presumption of defendant's reliance is that *nowhere in defendant Secretary's affidavit, his discharge letter, or in the motion for summary judgment has a claim been made that he or any of the defendants relied on the job description form.* Thus, we are back to inferences.[8] And, if inferences are to be drawn, a not wholly illogical one (as well as the legally required one) would be that since defendant did not offer evidence on the matter, and since he never referred to the job with the same title used in the description, his reliance on the job description is, to say the least, a disputed material fact.

Finally, whether we regard the relevant facts as the actual tasks or the inherent powers, it is important to note that the parties themselves, including counsel for defendant/appellants, understood the facts to be in dispute. On June 18, 1985, three days before the court ruled on the motion for summary judgment, the parties filed a joint pre-trial order, signed by all counsel and approved by the court, in which they listed as:

"VI.   CONTESTED MATERIAL FACTS
. . . .
3.   Whether the position from which plaintiff was separated is a policy making one.
4.   Whether political loyalty is an appropriate requirement for the performance of the office."

With this record before it, I cannot see how the district judge can be faulted for finding issues of fact to be present, and hence, for refusing to grant summary judgment on the merits. It is even more difficult for me to see how this court, on appeal, can find that there are no material facts in dispute without making inappropriate inferences, or without engaging in factual determinations itself.

In large part, the above discussion takes for granted the rule that, in the context of summary judgment, inferences should be resolved in favor of the party opposing the motion. However, because I do not wish this dissent to be read as a hyper-technical reliance on the rules, I would like to also point out the sound policy reason why, on the record before us, we cannot find the lack of a factual dispute. To do this, it is necessary to repeat the majority's reasoning in so holding. In short, the majority appears to say that they are interpreting, as a matter of law, the face value of a job description (as the basis for a qualified immunity defense).[9] Under this analysis, it appears that future courts, when faced with hotly contested job descriptions, can simply avoid the heat by noting that the job description, on its face, creates a *per se* defense for the official who discharges, regardless of doubt as to authorship or its circumstances, regardless of his reliance on the description, and regardless of the employee's bona fide assertions that the description, when compared to the objective

---

**8.** Defendant's affidavit, in explaining the cause of discharge/demotion, states that he "received only a cool greeting from her" and that he "interpreted such action as a manifestation of her negative attitude towards [him], the medical class, and her intention of not being cooperative to [his] program as Secretary of Health." *See* Affidavit of Dr. Luis A. Izquierdo-Mora, ¶¶ 7 and 8. This statement of perceived noncooperation as a basis of discharge, contrary to the majority's inference, says nothing about reliance on the job description form.

Moreover, the discharge/demotion letter, signed by him and referred to in his affidavit, makes reference to a job title ("confidential position number 2–00460 of Executive IV in the Office of Quality Control of the Health Services of the Department") which is *different* than that

used in the job description form ("Executive III" and "Program Director II"). Presumably, a government executive relying on the job description form would use the job title set forth therein. At the least, the *contrary* inference of "well, he was *probably* relying on the job description" cannot be properly drawn without a pro-movant bias.

**9.** Even accepting this, I still do not see how, given the district court's rationale below, we can decide the merits in the first instance. That is, if the majority indeed believes the district court mistook a legal dispute (the meaning of the job description) for a factual one, I again note that our recourse should be to *remand* for an initial, and final, decision below.

realities of the job or its "inherent powers," is simply false.

I have, in vain, searched for any authority lending even the slightest support to such a far-reaching and dangerous doctrine, one which would open the door to the most pervasive bureaucratic abuses and would leave public employees without the protection which the Supreme Court has emphatically sought to establish under *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1975) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). I can think of no other case in which such a factual situation would not be subject to challenge. Moreover, I can imagine, without considerable effort beyond the facts of this case, a scenario where a job description is prepared, where an employee must sign the description as a condition of employment, where policymaking duties and prerogatives are ascribed to the position, and where all the parties know beforehand that such policymaking duties are not inherent powers of the office, and likewise, will not be performed. When the discharge occurs, the government executive could claim qualified immunity on the basis of that document, apparently irrespective of the true facts, and even without having shown reliance on its contents as the basis for his actions. Can it be reasonably argued that such a situation is immune from factual dispute, and accordingly, that it should receive *a priori* insulation from a fact finder's inquiry? I think not, yet that may be the unintended consequences of today's majority ruling.

B. *The nature of the issues raised before the district court*

The second reason for dismissing this appeal for lack of appellate jurisdiction relates to the nature of the issues raised below. The suit filed in the district court is one seeking damages *and injunctive relief* under 42 U.S.C. § 1983. Assuming, *arguendo,* that the district court decided the merits of the qualified immunity defense, the question then is whether there can be an interlocutory appeal from such a ruling under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corporation,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). This is an issue of first impression in this circuit, specifically left undecided by the Supreme Court in *Mitchell v. Forsyth, supra* 105 S.Ct. at 2812 n. 5. The Court there held that similar orders were appealable in actions for *damages.* In the case of mixed actions seeking both damages and injunctive relief, however, I believe that there are good legal and policy reasons for not permitting an interlocutory appeal of the qualified immunity issue.

We obviously need not restate our previous reference to the general rule of federal appellate jurisdiction, embodied in 28 U.S.C. § 1291, prohibiting interlocutory appeals. *Ante,* p. 1196. A narrow exception to this rule, carved out by judicial exception, is the *Cohen* collateral order doctrine. The *Cohen* doctrine permits interlocutory appeal of "that small class [of orders] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen, supra* 337 U.S. at 546, 69 S.Ct. at 1225–1226. The *Cohen* doctrine has been refined to require that the trial court order conclusively determine the disputed question, that it resolve an important issue completely separate from the merits of the action, and that it be effectively unreviewable from final judgment. *Coopers & Lybrand v. Livesay, supra.*

In support of a narrow interpretation of the *Cohen* collateral order doctrine, the Supreme Court has stated that there are strong policy reasons against permitting interlocutory appeals:

"[preserving] the respect due trial judges by minimizing appellate-court interference with the numerous decisions they must make in the pre-judgment stages of litigation [and reducing] the ability of litigants to harass opponents and to clog

the courts through a succession of costly and time-consuming appeals."

*Flanagan v. United States, supra* 104 S.Ct. at 1054.

Due to these policy reasons, courts have consistently held that the collateral order doctrine, and the attendant right of interlocutory appeal, should be narrowly construed. *See, e.g., Powers v. Lightner,* 752 F.2d 1251, 1255 (7th Cir.1985); *Morgan v. Kopecky Charter Bus Co.,* 760 F.2d 919, 921 (9th Cir.1985); *Yakowicz v. Pennsylvania,* 683 F.2d 778, 783 (3d Cir.1982); *Bachowski v. Usery,* 545 F.2d 363, 371 (3d Cir.1976).

As previously indicated, among the narrow class of permissible interlocutory appeals are rulings denying immunity to public officials in *damage* actions. Thus, interlocutory appeal may be had to a ruling denying qualified immunity in actions for damages, "to the extent that it turns on an issue of law." *Mitchell v. Forsyth, supra* 105 S.Ct. at 2817. The reasoning behind this exception is clear: "the essence of … immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." *Id.,* 105 S.Ct. at 2815. To support its conclusion, the Court in *Mitchell* demonstrated a twofold concern. First, it noted that the consequences of not permitting such interlocutory appeal implicated the public's interest in being served by officials who acted with independence and without fear of being subjected to liability for money damages. Second, the Court stated that the unavailability of such relief exposed officials to additional burdens as a consequence of having to stand trial—"distraction … from their governmental duties, inhibition of discretionary

action, and deterrence of able people from public service." *Id.* (citing from *Harlow, supra* 457 U.S. at 816, 102 S.Ct. at 2737).

This reasoning is not applicable where, as in the present case, resolution of the immunity question, in the context of a joint cause of action for damages and equitable relief, *does not conclusively terminate the suit.* In short, because plaintiff below included claims for equitable relief, and because such claims are not subject to the qualified immunity defense, *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the trial below will proceed. So, the denial, or for that matter, the granting of immunity from the damages action does not end the official's continued participation in the law suit. The parties will continue to litigate substantially the same controversy, with only the remedy, one equitable and the other monetary, being at variance. Since the factual and procedural setting will not be essentially different regardless of whether only the equitable issues are left or whether both the equitable and damage questions remain subject to discovery and trial, the officials cannot be benefited by the allowance of a fractioned appeal.[10]

On the other hand, the policy reasons against expanding the collateral order doctrine are, if anything, even stronger now than when 28 U.S.C. § 1291 was enacted. The appellate docket continues to increase dramatically. In the year ending June 30, 1985 there were 33,360 appeals filed in the twelve courts of appeal excluding the Federal Circuit, as compared to 31,387 the previous year, a six percent rise in filings.[11] During the same period, the number of

---

**10.** This is especially so given that, in this case, plaintiffs have joined pendent state law damages claims. Because the state law damages claims arise out of "a common nucleus of operative fact," *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), the lawsuit below will not only continue on the federal law equitable relief claim, but on state law *damages* claims. Thus, to the extent the majority's concern is based on damage liability apprehension, such apprehension of damages would appear to continue because of the survival of the state claims. Under this

scenario, the majority's concern boils down to a distinction between the apprehension felt by defendants on federal versus state law damages liability. In my view, the strong federal policy against interlocutory appeals cannot be made to give in to such distinctions, and much less to the refined concerns on which they are based.

**11.** *Report of the Proceedings of the Judicial Conference of the United States, September 7–18, 1985,* Administrative Office of the United States Courts, Washington, D.C., p. 42 (1985).

appeals pending in the courts of appeal, increased nine percent to 24,758.[12] For a superficial glance at the statistical trend we need but compare these figures to the year 1975 in which the filings for all courts of appeal amounted to 16,658 cases and the pending appeals to 12,128.[13] Moreover, I need not dwell unduly on the escalating cost of litigation since the debut of 28 U.S.C. § 1291. Thus, by widening the door to interlocutory appeals, we provide additional opportunities for "litigants to harass opponents .... through a succession of costly and time-consuming appeals," *Flanagan v. United States, supra.* This is particularly obnoxious when such appeals are financed by the taxpaying public.[14] It seems at least somewhat incongruous to me that despite the Chief Justice's repeated pleas for correction of these problems by various means,[15] it is the federal appellate judiciary which, by expanding interlocutory jurisdiction, adds to the burden.

The majority does not regard its expansion of the availability of interlocutory appeals as unnecessary. Indeed, the majority adheres to one of the policy prongs of *Mitchell,* that apprehension of personal liability for damages impairs good government. With all due respect, the majority's concern is in my view quixotic. I say this because the public executive's apprehension as to money damage liability has been mooted by the Puerto Rico legislature. In short, Puerto Rico law provides government officials such as defendants below

not only with a subsidized defense but with full indemnification for damage awards. The law reads as follows:

"[e]very official, [or] employee ... of the Commonwealth of Puerto Rico who is sued for damages in his personal capacity, when the cause of action is based on alleged violations of the plaintiff's civil rights, due to acts or omissions committed in good faith, in the course of his employment and within the scope of his functions, may request the Commonwealth of Puerto Rico to provide him with legal representation, and to subsequently assume the payment of any judgment that may be entered against his person ... "

32 L.P.R.A. § 3085.

By reason of the cited statute, appellant/defendants are not affected in any substantial fashion, whether in their personal or official capacity, by having to litigate the damage action without benefit of an interlocutory appeal. This is particularly so since trial must nonetheless proceed on the issue of equitable relief.[16]

Given the above, I cannot help but examine, on the other side of the coin, the plight of appellee/plaintiff. In addition to suffering the ignominy of a discharge/demotion after many years of faithful government service, she has been required, upon assertion of her constitutional claim, to fight against the full brunt of "city hall's" economic and political weight, while bearing

---

12. *Id.*

13. United States Courts of Appeals, National Statistical Profile, *Federal Court Management Statistics, 1975,* Administrative Office of the United States Courts, Washington, D.C., p. 30 (1975).

14. As noted below, the Commonwealth of Puerto Rico pays for the defense of this suit. 32 L.P.R.A. § 3090.

15. *See generally,* "Annual Message on the Administration of Justice," Midyear Meeting of the American Bar Association, Detroit, Michigan (February 17, 1985); "1984. Year-End Report on the Judiciary"; "1983. Year-End Report on the Judiciary."

16. The majority expresses a concern as to personal liability for punitive damages, which ordi-

narily follow from actions in bad faith. Thus, it would appear that, under the good faith requirement of the indemnification statute, officials would be left to pay their punitive judgments.

I believe the legislative judgment of drawing the line at good faith is a proper one. In short, the legislature has determined that apprehension as to one's bad faith actions is appropriate. Egregious and knowing violations are just that. Thus, if the legislative judgment is not to condone them *a priori,* ours should not be either. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2738–2739, 73 L.Ed.2d 396 (1982) ("Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; ...").

her own costs, both economic and emotional, on these fractioned appeals. Surely if *Branti* and *Elrod* are to have any meaning such a double standard should not be tolerated.

As pointed out by the majority, I am not totally bereft of support for my position. The Court of Appeals for the Fourth Circuit in *Bever v. Gilbertson*, 724 F.2d 1083, 1086–1087 (4th Cir.1984), *cert. denied sub. nom., Rockefeller v. Bever*, —— U.S. ——, 105 S.Ct. 349, 83 L.Ed.2d 285 (1984), in considering the very question now before us reasoned as follows:

> The plaintiffs seek equitable relief as well as money damages, and the [defendants] have no immunity from being put to trial on the equitable claims. They are the principal defenders of the state's position. They will bear a major responsibility for the outcome of the litigation and will be among the principal witnesses at the trial. Whether or not they are immune from an assessment of damages against them in their individual capacities, the litigation will demand their time and attention. A present declaration of immunity from damage claims cannot avoid the diversion of their attention from other official duties which the litigation will occasion.

(Footnote omitted).

The above concerns of the *Bever* majority, the strong judicial policy against interlocutory appeals, and the fact that the trial below will regardless proceed as to equitable relief, require a conclusion contrary to that reached by the majority. Appellate jurisdiction serves no great purpose at this point in this case. Accordingly, it should not exist.

## II. *Qualified Immunity*

The majority, in my view, has today changed the law. Thus, because I believe the Supreme Court test for qualified immunity to be fundamentally at odds with that of the majority, I again return to *Mitchell v. Forsyth*. The language in *Mitchell* that governs our present inquiry runs as follows:

> All [the appellate court] need determine is a question of law: whether [1] the *legal* norms allegedly violated by defendant were *clearly established*, or [2] in cases where the district court has denied summary judgment for the defendant on the ground that, even under the defendant's version of the facts the defendant's conduct violated clearly established *law*, whether the *law* clearly proscribes the actions defendant claims he took.

*Id.* 105 S.Ct. at 2816 (emphasis supplied).

The above language addresses both the issue of appealability and *the test for qualified immunity* to be applied on such appeals. Two potential tests, proper for both a district court and an appellate tribunal, follow from the above quote.[17] First, *assuming plaintiff's version of the facts to be correct*, the court must find that the *right*, under such facts, is clear. *See Mitchell v. Forsyth, supra* 105 S.Ct. at 2816–2817; *Fernández v. Leonard*, 784 F.2d 1209, 1213–1214, 1216–1217, (1st Cir. 1986) (*plaintiff's* version of facts accepted for purposes of appeal from denial of summary judgment on qualified immunity). If plaintiff's right is *not* clearly established under his facts, plaintiff loses as a matter of law. Likewise, if plaintiff's right *is* clearly established, and if defendant can show no objective good faith,[18] plaintiff wins. Thus, under such circumstances, defendant's motion for summary judgment is defeated.[19] *Id.*

**17.** The actual inquiry by the *Mitchell* Court did not involve presumptions of factual nondispute because, due to a hearing by the district court below, the facts on appeal were undisputed. Given these undisputed facts, the Court directly proceeded to inquire whether there had been a violation of clearly established law. The above-cited language, then, provides the only insight in *Mitchell* as to how, where facts are disputed

in the pleadings, a court can nonetheless find an issue of law; in short, the court can adopt *certain* versions of the facts as the basis of a legal ruling.

**18.** I address this point at pp. 1207–1209 *post*.

**19.** Implicit in this concept of accepting plaintiff's version of the facts is the corollary that

The second permissible legal inquiry under *Mitchell*, in the face of contested facts, is to find that *"even under defendant's version of the facts ... the law clearly proscribes the actions defendant claims he took." Id.* 105 S.Ct. at 2816 (emphasis supplied). As the language reveals, the *Mitchell* court specifically limited acceptance of defendant's facts to situations where defendant would *lose* on the immunity issue. Hence the error of the majority opinion, for it appears to accept defendant-movant's statement of the facts, in a summary judgment context, as true. Such a result not only misconstrues *Mitchell*, but it virtually amends Rule 56 so as to provide potentially impermeable defenses to actions based on the Constitution.

Thus, I note my strong disagreement with the majority as to the test we must apply. However, because this is a dissenting opinion, I feel obliged to discuss the qualified immunity merits not only under my approach but also that of the majority.

As noted above, the proper test involves a three-step inquiry. First, and most determinative, we must decide whether, at the time of plaintiff's discharge/demotion, there "existed clearly established statutory or constitutional rights which a reasonable person would have known." *Harlow v. Fitzgerald, supra* 457 U.S. at 818, 102 S.Ct. at 2738. Second, and intrinsically related to the first inquiry, the examination is one of "objective reasonableness of [the public executive's] conduct measured by reference to clearly established law." *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012,

3018, 82 L.Ed.2d 139 (1984); *see also Mitchell v. Forsyth, supra* 105 S.Ct. at 2818.

Third, and finally, the issues of clearly established law and objective reasonableness must and can only be assessed in terms of the circumstances. In the context of summary judgment, I have already noted that, where a bona fide dispute exists over material facts, both *Mitchell* and *Fernández v. Leonard* require us to accept plaintiff's version. Thus, I will discuss the above two inquiries—clearly established rights and reasonableness—both under plaintiff's version and, because this is a dissent, under the version accepted by the majority, i.e., defendant's. In my view, for purposes of this appeal, the outcome is the same: appellant/defendants do not prevail.

A. *Was there a violation of "clearly established" law which a reasonable person would have known ?*

In 1975 the Supreme Court decided the seminal case of *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1975). The issue presented to the Court was "whether public employees who allege that they were discharged or threatened with discharge solely because of their partisan political affiliation or nonaffiliation state a claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments." *Id.* at 349, 96 S.Ct. at 2678. Writing for the plurality, Justice Brennan, joined by two other Justices, held that patronage dismissals violated the First and Fourteenth Amendments, *id.* at 355–360, 96 S.Ct. at 2680–2683, and limited the propriety of patronage dismissals to policymaking positions.[20] *Id.* at 367–368, 96 S.Ct. at

---

plaintiffs will not be allowed to generate spurious disputes. I believe that the rules governing summary judgment, as well as the district courts, are well-equipped to spot frivolity. Moreover, I repeat that my vote is in no small part influenced by the disinterested nature of the affidavits of plaintiff's predecessors. Finally, we must remember that the context here is summary judgment, where movants bear heavy burdens regarding nondispute over facts. As the *Mitchell* court noted, plaintiff's may well be unable to prove all their factual claims at trial. *Id.* 105 S.Ct. at 2815. Thus, I believe that, where plaintiff's claims are not spurious and state a violation of clearly established rights, we cannot

read *Mitchell* (where the facts were undisputed) as amending the rules of summary judgment so that defendant-movant's allegations and inferences are accepted. Such a result may not only be legislative with respect to Rule 56, but it could effectively, in the context of this case and others, suppress the First Amendment rights at stake.

**20.** As to the line between policymaking and nonpolicymaking positions, Justice Brennan noted: "... it is the government's burden to demonstrate an overriding interest in order to validate an encroachment on protected interests ..." *Id.* at 368, 96 S.Ct. at 2687. This stern

2686–2687. In a concurring opinion, Justice Stewart joined by Justice Blackmun, restricted their concurrence to nonpolicymaking, nonconfidential positions. *Id.* at 374–375, 96 S.Ct. at 2690–2691. Four Justices dissented.

Four years later the Court decided *Branti v. Finkel, supra.* This time a solid majority of six Justices again ruled that the First and Fourteenth Amendments protected public employees from discharge solely by reason of their political beliefs. *Id.* 445 U.S. at 513–517, 100 S.Ct. at 1292–1294. More importantly, however, was the clarification of the standard to be applied in patronage discharge cases. The Court held that:

> It is equally clear that party affiliation is not necessarily relevant to every policymaking or confidential position. The coach of a state university's football team formulates policy, but no one could seriously claim that Republicans make better coaches than Democrats, or vice versa, no matter which party is in control of the state government. On the other hand, it is equally clear that the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments. *In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.*

*Id.* at 518, 100 S.Ct. at 1294–1295 (emphasis supplied).

warning would be reiterated by a clear majority of the Court soon thereafter.

**21.** See Appendix. I note these cases not to imply that each fully repeats *Branti,* but simply to show that the case, by any standard, has been accepted as the law.

As I read *Branti,* it establishes the following rule: (1) it is a violation of the First and Fourteenth Amendments for a state official to discharge an employee by reason of his political affiliation or lack thereof, even though that employee may be a policymaker or hold a confidential position, (2) unless the discharging authority affirmatively establishes that political affiliation is an appropriate requirement for the effective performance of the office in question. The import of *Branti* in terms of what rights are "clearly established" is critical. As the language above reveals, the *Branti* Court provided two stern warnings: (1) that cavalier reliance by government employers on labels such as "policymaking" will be rejected by the courts; and (2) that the burden of proof in showing political affiliation to be an appropriate requirement rests on the defendant. This, in short, is a strict test.

In the five years following the *Branti* decision, and prior to de Abadia's discharge/demotion, *Branti* has been cited and/or followed in a vast number of cases both in the federal and state systems.[21]

Puerto Rico has not fallen behind in this respect. The Supreme Court of Puerto Rico, in the leading case of *Ramos-Villanueva v. Secretario de Comercio,* 112 D.P.R. 514 (1982), fully embraced *Branti,* and cited the above-quoted passage in ruling that the Regional Directors of the Commonwealth's Commerce Department, although policymakers and confidential employees,[22] could not be discharged for political reasons, since *it had not been established by the hiring authority that political affiliation was an appropriate requirement for the effective discharge of that post.* *Id.* at 517–518, 100 S.Ct. at 1294–1295. This adherence to *Branti* was

**22.** It should be noted that under Puerto Rico law a confidential employee is defined as:

> ... [T]hose who intervene or collaborate substantially in the formulation of the public policy, who advise directly or render direct services to the head of the agency ...

3 L.P.R.A. § 1350.

again reiterated in *Franco v. Municipality of Cidra*, 113 D.P.R. 260 (1982) (discharge of confidential employee improper), in *Clemente González v. Department of Housing*, 114 D.P.R. 763 (1983), and most recently in *Colón v. Urban Renewal and Housing Corporation*, 84 J.T.S. 52 (June 4, 1984). In *Colón*, speaking for a unanimous court, Justice Negrón-García, after citing *Branti*, stated as follows:

> The courts must break the trend and vicious circle established on the island, of substituting government personnel, after each general election, on grounds foreign to a sound public administration; the political patronage and spoils system. The scenario recurs each time there is a change in the political party in power. The adverse consequences are fatal and alarming: the reduction in funds is substantial.

*Id.* (Citations and footnotes omitted).

To the above it should be added that, if necessary, this court could take judicial notice of a fact alluded to by Justice Negrón-García; namely, that in Puerto Rico's often highly-charged political atmosphere, judicial action regarding political discharges is not back-page news. Rather, its far-reaching consequences make it the subject of headline copy and, to say the least, extensive public discussion.

Considering all this, I do not think it can be seriously contended that at the time of de Abadia's discharge/demotion in 1985, the *Branti* standard was not clearly established *law* and was not known by any reasonable government executive in Puerto Rico.

There is an additional point. As stated by the United States Supreme Court and reiterated by the Puerto Rico Supreme Court, *Branti* also involves a burden. The burden is that the *defendant* must show political affiliation to be appropriate, and that nodding reliance on labels of policy-

making will not suffice. It is with respect to this prong of *Branti* that the majority appears willing to presume ignorance of the *law* by defendants.[23] But it is precisely this prong of *Branti* that the Puerto Rico Supreme Court, in addition to many of the federal courts cited in the appendix, have made resoundingly clear. Under any standard there is, to my view, a clearly established right which defendants could only ignore at their peril.

B. *Did appellants meet their burden of establishing that they reasonably believed that political affiliation was an appropriate requirement for the effective discharge of de Abadia's position ?*

The above statement of the objective reasonableness/good faith test appears to be that of the majority. The problem is that, in order to determine what behavior is reasonable, we must assume facts.

The facts as alleged by plaintiff, if we were to presume these as accurate (as we must), establish that defendant has not met his burden. It is undisputed that plaintiff was Director of the Quality Control Program of the Department of Health. In her complaint, plaintiff describes the Quality Control Program as follows:

> The Quality Control Program of the Department of Health has the distinct responsibility of providing the administrative structure for more than 18 examining boards having to do with the several occupations concerned with the health in Puerto Rico, including the Board of Medical Examiners.

Briefly stated, plaintiff's position was to direct a program based on establishing standards for admission to the health profession. Defendant never directly challenges this assertion of fact, nor does defendant state, in his motion for summary judgment, why policy as to who gets to operate on us is the subject of partisan

---

23. I might add that this is the only setting with which I am familiar wherein a claimant cannot rely upon the timeless maxim *ignoratum legis neminem excusat.* Here claimant is required to prove not only that she had a legal right that

was violated, but additionally that that defendant should have known of the right, something which clearly runs contrary to the quoted maxim and its presumption that everyone knows the law.

rancor. Thus, without further elaboration on the facts, and accepting plaintiff's version, it cannot be said that defendant has established even a reasonable belief that political affiliation would be necessary for effective performance of the position.

But the description of the program she administered as stated in the complaint is not all that plaintiff offered. As previously noted, plaintiff also includes the affidavits of her predecessors, not members of plaintiff's party, and who served under opposite party superiors. These affidavits state that the position was not a policymaking one, and that based on their experience, political affiliation was not an appropriate requirement. As noted above, these disinterested statements cannot be regarded as frivolous, and contain an overwhelming inference, if not a direct statement, on the issue of inherent powers. In fact, if the disinterested affidavits of one's opposite party predecessors do not suffice, I cannot see what will.

Thus, taking the *Branti* burdens and combining them with plaintiff's nonfrivolous version of the facts, it cannot be said that defendant's actions were, objectively speaking, reasonable in terms of the burden. In short, a discharge occurred with no indication that even the *label* of policymaking was accurate, and more importantly, that, given the nature of the program, political affiliation was in any way appropriate. The position as previously occupied had not been regarded as one subject to patronage. Under such facts, defendant cannot be said to have been objectively reasonable in light of the *Branti* burdens, and he must be made to challenge plaintiff's version at trial.

I now address the majority's inquiry; that is, whether under defendant's version of the facts, he has shown himself to have reasonably believed that he met his burden of showing political affiliation to be appropriate.

24. The translation appearing in the record is incorrect in translating "al Control de Calidad de los Servicios de Salud" to mean "related to the health services." The proper translation, as noted above, is "related to the *control of the*

No evidence was presented to the court below on this issue, except for the job description. Thus, assuming that only that document is relevant to a determination of whether or not political affiliation was an appropriate requirement for the effective discharge of de Abadia's position, a contention which I do not concede, appellant/defendants have put all their eggs in one basket, and their case turns on whether or not that document is sufficient for purposes of overcoming their burden.

I begin with the proposition that there is nothing inherent in the title or position of de Abadia which would alert us to the inevitable conclusion that her's is a job which would require party membership. After all, the control of the quality of health services is a neutral subject matter which, without further inquiry as to the facts, no party would seem to be against, and all would ostensibly support. But the majority contends that what counts is the job description, thus we must again look at that document, particularly ¶¶ 2 and 7, upon which the majority relies for its conclusion that *political affiliation* was required of someone who looks after the quality of health services.

The crucial information according to the majority is as follows, stated beneath the heading "Duties of the Position":

"2. Advise the Secretary, Governor's Aids and Legislators in the establishment of the philosophy, public policy, goals, and objectives related to the control of the quality of the health services.[24]

. . . . .

7. Recommend drafts of bills and bills directed to implement, amend or derogate provisions allowing for the development of the functions assigned to the Program; discuss them; process them for the consideration of the Secretary,

*quality of* health services," a description more reflective of plaintiff's assertion (not clearly rebutted by defendant) that the role of the agency she directed was to establish standards relating to admission to the health profession.

the Governor or the Legislature and give follow up to determine the action taken." As in the case of the job title, there is nothing inherent in the language of ¶ 2 or 7 that will help appellant/defendants to overcome their burden of establishing *political affiliation* as an appropriate requirement for effective discharge of de Abadía's position. Although undoubtedly ¶¶ 2 and 7 establish that her position is one which advises regarding *policymaking,* this is only part of the story. As we know, *Branti* unequivocally holds "that party affiliation is not necessarily relevant to every policymaking or confidential position." *Branti* at 518, 100 S.Ct. at 1295. At this point it would be relevant to inquire whether the "effective performance" of this position was affected by the fact that past office holders belonged to a different party than that of the government in office at the time. Unfortunately, however, we are again faced with the majority's prohibition against going outside the contents of the job-description document for help. Thus limited we ask, is there anything in ¶¶ 2 and 7 which would indicate whether or not political affiliation is appropriate?

I believe there is a clear indication in the job description that political affiliation is *not* an appropriate factor. Both paragraphs refer to the various advisory actions which may be taken with reference to "the Secretary, the Governor [or his aids] and [or] *Legislators [the Legislature].*" Although it may be presumed that the Secretary and the Governor (or his aids) all belong to the same political parties, this most assuredly cannot be the case as applied to the members of Puerto Rico's Legislature, where even under the worst of circumstances minority parties are guaranteed representation.[25] Since de Abadía is thus required to advise legislators of *all* parties, *party affiliation cannot be said to be an appropriate requirement for the effective discharge of the position in question.* Most importantly, on the state of defendant's allegations as they are before us, I do not think it can be argued, without

a serious departure from *Branti,* that we should accept (and regard as reasonable) the conclusion that "[P.D.P.] members make better [directors of health services quality control] than [P.N.P.] members." *Branti, supra* at 518, 100 S.Ct. at 1294–1295. Needless to say this conclusion would be crystal clear, if the evidence excluded from consideration by the majority were available for presentation before a jury, where it properly belongs.

Last, but not least, in considering appellant/defendants' burden that they reasonably believed that political affiliation was an appropriate requirement, I feel obliged to reiterate that there is no evidence in the record that Dr. Izquierdo-Mora (or the other defendants) relied upon, or even knew of the existence of, the job description when he discharged/demoted de Abadía.

For the reasons stated above, I believe summary judgment below was properly denied by the district court. Accordingly, I dissent.

### APPENDIX

*John M. Bever v. John D. Rockefeller, IV.,* 724 F.2d 1083, 1088 (4th Cir.1984); *Frank Brown v. Lamar Alexander,* 718 F.2d 1417, 1427 (6th Cir.1983); *Paul A. LaFalce v. Michael Houston,* 712 F.2d 292, 293 (7th Cir.1983); *Robert Livas v. Edward Petka,* 711 F.2d 798, 800 (7th Cir.1983); *Jimmie McBee, et al. v. Jim Hogg County, Texas, et al.,* 703 F.2d 834, 837 (5th Cir.1983); *Ardith M. Horne, et al. v. Merit Systems Protection Board, et al.,* 684 F.2d 155, 158 (D.C.Cir.1982); *Suzanne S. Harris, et al. v. Polly Conradi, et al.,* 675 F.2d 1212, 1217 (11th Cir.1982); *Fox & Company, et al. v. Vincent Schoemehl, et al.,* 671 F.2d 303, 304 (8th Cir.1982); *Lawrence M. Gibbons, et al. v. Christopher S. (Kit) Bond, et al.,* 668 F.2d 967, 968 (8th Cir.1982); *Charles E. Sweeney, et al. v. Christopher S. (Kit) Bond, et al.,* 669 F.2d 542, 545–546 (8th Cir.1982); *Peter J. Laskaris v. Richard Thornburgh, et al.,* 661 F.2d 23, 25 (3d Cir.1981); *Harry M. Ness v. Elizabeth N.*

25. *See* P.R. Const. art. III, § 7; 16 L.P.R.A. 3272.

*Marshall, et al.,* 660 F.2d 517, 520 (3d Cir.1981); *Edward Nekolny, et al. v. Ann B. Painter, et al.,* 653 F.2d 1164, 1169 (7th Cir.1981); *Benny B. Barrett v. Carl Thomas, Sheriff,* 649 F.2d 1193, 1200–1201 (5th Cir.Unit A 1981); *Myron J. Aufiero v. Owen L. Clarke, et al.,* 639 F.2d 49, 50–51 (1st Cir.1981); *Joseph Loughney, et al. v. Eugene F. Hickey, et al.,* 635 F.2d 1063, 1064 (3d Cir.1980); *Carolyn Mazus v. Dept. of Transportation, Comm. of Pa., et al.,* 629 F.2d 870, 873 n. 1 (3d Cir.1980); *Lipinski, et al. v. Dietrich, et al.,* 578 F.Supp. 235, 240 (ND Ind.1984); *de la Cruz v. Pruitt,* 590 F.Supp. 1296, 1303 (ND Ind. 1984); *Nilan v. The Honorable Salvatore De Meo, et al.,* 575 F.Supp. 1225, 1227 (ED Pa.1983); *Dove v. Fletcher,* 574 F.Supp. 600, 603 (WD La.1983); *McMullan, et al. v. The Honorable Dick Thornburgh, et al.,* 570 F.Supp. 1070, 1071 (ED Pa.1983); *Barnes, et al. v. Freeman (Teek) Bosley, Jr., et al.,* 568 F.Supp. 1406, 1408 (ED Mo.1983); *Douglas, et al. v. Ware, et al.,* 568 F.Supp. 966, 970 (SD W.VA.1983); *Landry, et al. v. Farmer, et al.,* 564 F.Supp. 598, 604 (D.R.I.1983); *Gannon, et al. v. Daley, et al.,* 561 F.Supp. 1377, 1382 (ND Ill.1983); *Dehorty v. New Castle County Council, et al.,* 560 F.Supp. 889, 893 (D.Del.1983); *Dusanenko, et al. v. Maloney, et al.,* 560 F.Supp. 822, 828 (SD N.Y.1983); *Begg v. Moffitt,* 555 F.Supp. 1344 (ND Ill.1983); *Joyner v. Lancaster, et al.,* 553 F.Supp. 809, 817 (Mid.D.N.C.1982); *Shakman, et al. v. The Democratic Organization of Cook County, et al.,* 552 F.Supp. 907, 908 (ND Ill.1982); *Dumas v. Treen,* 551 F.Supp. 1162–1164 (Mid.D.La. 1982); *Rosenbaum v. Larson, et al.,* 442 F.Supp. 608, 610 (Mid.D.Pa.1982); *Visser v. Magnarelli, et al.,* 542 F.Supp. 1331, 1337 (ND N.Y.1982); *Ecker v. Cohalan, et al.,* 542 F.Supp. 896, 901 (ED N.Y.1982); *Sames, et al., v. Gable, et al.,* 542 F.Supp. 51 (ED Pa.1982); *Evenson, et al. v. Joseph Crawford, et al.,* 539 F.Supp. 686, 689 (D.N.D.1982); *Goldberg, et al. v. The Village of Spring Valley et al.,* 538 F.Supp. 641, 644 (SD N.Y.1982); *Moorhead v. Gov't of the V.I., et al.,* 542 F.Supp. 213, 215 (DC V.I.1982); *Sands v. Starke County Board of Commissioners,* 530 F.Supp. 712 (ND Ind.1982); *Orenstein v. Bond,* 528 F.Supp. 513, 517 (ED Mo.1981); *Gannon, et al. v. Daley, et al.,* 531 F.Supp. 287, 289 (ND Ill.1981); *Joseph, et al. v. Bond, et al.,* 522 F.Supp. 1363, 1364 (WD Mo.1981); *Joos v. Bond, et al.,* 526 F.Supp. 780, 784 (ED Mo.1981); *Gibbons, et al. v. Bond, et al.,* 523 F.Supp. 843, 850 (WD Mo.1981); *Kuhlmann v. Bloomfield Township, et al.,* 521 F.Supp. 1242, 1244 (ED Wis.1981); *Fox & Co., et al. v. Schoemehl, etc., et al.,* 519 F.Supp. 849, 851 (ED Mo.1981); *Brunton, et al. v. U.S.A.,* 518 F.Supp. 223, 225 (SD Ohio 1981); *Brady v. Paterson, et al.,* 515 F.Supp. 695, 696 (ND N.Y.1981); *Sweeney, et al. v. Bond, et al.,* 519 F.Supp. 124, 127 (ED Mo.1981); *Soto v. Chardón, et al.,* 514 F.Supp. 339, 341 (D.P.R.1981); *Layden v. Costello, et al.,* 517 F.Supp. 860, 862 (ND N.Y.1981); *Garretto v. Cooperman, et al.,* 510 F.Supp. 816, 818 (SD N.Y.1981); *Shakman, et al. v. The Democratic Organization of Cook County, et al.,* 508 F.Supp. 1063, 1068 (ND Ill.1981); *Mirabella, et al. v. The Board of Elections of the City of New York,* 507 F.Supp. 338, 339 (SD N.Y. 1980); *Trippy, et al. v. Sams,* 512 F.Supp. 5, 6 (ED Tenn.1980).