USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2109
No. 97-2248
 KATHLEEN L. LYONS, ET UX.,
 Plaintiffs, Appellees,
 v.
 JESSE BROWN, SECRETARY OF VETERANS AFFAIRS,
 Defendant, Appellee,
 and
 NIKHIL I. PATHAK, M.D. and
 UNITED STATES OF AMERICA,
 Defendants, Appellants.

 APPEALS FROM THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF MAINE
 [Hon. Eugene W. Beaulieu, U.S. Magistrate Judge]

 Before
 Boudin, Circuit Judge,
 Bownes and Cyr, Senior Circuit Judges.

 Mark W. Pennak, Appellate Staff, Civil Division, Department of
Justice, with whom Frank W. Hunger, Assistant Attorney General, Jay
P. McCloskey, United States Attorney, and Barbara L. Herwig,
Appellate Staff, Civil Division, Department of Justice were on
brief for appellant United States.
 Alton C. Stevens with whom Marden, Dubord, Bernier & Stevenswas on brief for appellant Nikhil I. Pathak.
 Richard L. O'Meara with whom Murray, Plumb & Murray, Eric M.
Mehnert and Jones, Bernstein & Mehnert were on consolidated brief
for plaintiffs.

October 21, 1998

 
 BOUDIN, Circuit Judge. The United States and Dr. Nikhil
Pathak, a federal employee, appeal from the striking of the U.S.
Attorney's certification that Dr. Pathak was acting within the
scope of employment when he allegedly committed certain of the acts
that form the basis for claims against him. The claims, made by
Kathleen Lyons, effectively charged Dr. Pathak with sexual
harassment. This appeal involves the interpretation and
application of the Westfall Act, 28 U.S.C. 2679(d).
 The facts, as set forth below, either are undisputed or
are drawn from the complaint (and thus represent allegations taken
as true only for purpose of this appeal). From 1989 to 1995,
Kathleen Lyons was a head nurse in the renal dialysis unit of the
Veterans Administration hospital in Togus, Maine. Her supervisor
was Dr. Nikhil Pathak. According to Lyons, Dr. Pathak made
advances to her while she and the doctor were attending a
nephrology conference in Chicago in June 1994.
 Lyons says that when she spurned Dr. Pathak, he
retaliated against her by (for example) not talking to her at work,
challenging her laboratory test requests, and writing up a
complaint against her. Lyons claims that Dr. Pathak also made
harassing comments, suggested that the dialysis unit might be
closed, withdrew the unit from a research study, and questioned a
police officer about missing log books, apparently implying that
Lyons was somehow responsible for them. Lyons also says that the
doctor inappropriately pushed her during the Chicago trip and
inappropriately hugged her at the hospital in Maine.
 In August 1995, Lyons filed suit in the federal district
court. Putting aside a civil rights conspiracy claim later
dismissed, the complaint charged the Secretary of the Department of
Veterans Affairs as an employer with violations of Title VII, 42
U.S.C. 2000e et seq., and charged Dr. Pathak with state law
claims for infliction of emotional distress, slander, and assault
and battery. The federal and state claims were separated for
purposes of trial, and Lyons prevailed in a jury trial on the Title
VII claims, obtaining a $375,000 judgment against the government;
that judgment is apparently not yet final due to the continuing
pendency of Lyons' state-law claims against Dr. Pathak.
 Under the Westfall Act, the Attorney General can certify
that a federal employee named as a defendant in a civil case was
"acting within the scope of his office or employment at the time of
the incident" that serves as the basis for a tort claim against
that employee. 28 U.S.C. 2679(d)(1). If the certification
stands, the defendant federal employee is immune from suit on
claims arising from certified conduct, and the United States is
substituted as the defendant with regard to those claims. Id. 
2679(b)(1), (d)(1). The employee can also petition the court to
order certification if the Attorney General has wrongly refused to
certify. Id. 2679(d)(3).
 On March 19, 1997, the U.S. Attorney for the District of
Maine certified that Dr. Pathak was generally acting within the
scope of employment "regarding the issues directly related to
patient care, clinical judgment, and hospital procedures and
operations," including "allegations regarding critical values,
physician's orders, rounds, and quality assurance reports." 
Specifically, the certificate identified 22 of 240 paragraphs of
the complaint as comprising certified conduct; for example, the
U.S. Attorney did not certify the alleged inappropriate hugging and
pushing but did certify Dr. Pathak's work complaint against Lyons,
his challenges to her test requests, and his refusals to talk to
her at the hospital.
 Scope of employment certifications by the government are
reviewable by the district court. See Gutierrez de Martinez v.Lamagno, 515 U.S. 417, 436-37 (1995). In April 1997, Lyons moved
to strike the government's certificate and sought an evidentiary
hearing. Dr. Pathak, who had earlier requested certification of
all of his conduct, maintained that the government had not gone far
enough in its certificate. The district court requested that all
parties brief the issues and later heard oral argument.
 On August 1, 1997, the district court issued an order
striking the scope certificate entirely, holding that the
government could not pick and choose among the alleged acts in the
complaint; rather the court said that the correct approach was to
evaluate whether in "the totality of the circumstances, the conduct
alleged in the Complaint occurred within the scope of . . .
employment." Taking the complaint as a whole, the court said that
sexual harassment amounting to assault and battery was clearly
outside the scope of employment. This appeal followed, the
government urging reinstatement of its original certificate and Dr.
Pathak arguing that even more acts should have been certified.
 At the threshold, Lyons says that the district court's
order striking the certificate is not yet reviewable. Lyons
recognizes that denials of immunity in the district court are
customarily subject to immediate interlocutory appeal, Behrens v.
Pelletier, 516 U.S. 299 (1996), with an exception not here
pertinent, Johnson v. Jones, 515 U.S. 304, 315-16 (1995), under the
collateral order doctrine of Cohen v. Beneficial Indus. Loan Corp.,
337 U.S. 541 (1949). For this purpose, qualified immunity in
federal civil rights actions and Westfall Act immunity are treated
in the same fashion. See Taboas v. Mlynczak, 149 F.3d 576, 579
(7th Cir. 1998).
 Nevertheless, Lyons says that review now is premature
because, even if the government's certificate were reinstated, Dr.
Pathak would still have to stand trial for the uncertified acts
alleged in the complaint. Thus, the disruption and delay of an
interlocutory appeal would be incurred not to rescue a defendant
from discovery and trial but merely to limit the claims against
him. Whatever force the argument might otherwise have, it was
rejected by the Supreme Court in Behrens. There the Court said
that an interlocutory appeal lay from a denial of immunity even if
granting it would not resolve the entire case. See 516 U.S. at
311-13.
 Turning to the merits, the first question is to determine
the "unit" for which certification is appropriate under the
Westfall Act. Where a single case involves multiple claims,
certification is properly done at least down to the level of
individual claims and not for the entire case viewed as a whole. 
This is evident from Behrens itself as well as other cases
approving certification of some claims but not others. E.g., De
Abadia v. Izquierdo Mora, 792 F.2d 1187, 1190 (1st Cir. 1986);
Araujo v. Welch, 742 F.2d 802, 805-06 (3d Cir. 1984).
 The harder question is how to handle a situation in which
an individual claim taken separately encompasses multiple
incidents. This question is posed by the present case; for
example, Lyons' infliction of emotional distress charge embraces a
whole series of individual incidents (e.g., hugging, a negative
report, refusing to converse). In all likelihood, we are
addressing an issue to which Congress gave no thought when it
framed the Westfall Act.
 The Westfall Act is an offshoot of statutes imposing
liability on the federal government for such events as accidents
involving federal-employee drivers--events in which there is
commonly a single incident (the crash) corresponding to a single
claim (driver negligence). See Behrens, 516 U.S. at 303; Nasuti v.
Scannell, 906 F.2d 802, 809 (1st Cir. 1990). While Congress surely
knew that a complaint may include multiple claims, a claim
supported by many divergent acts is less common. Indeed, neither
side has found a Westfall Act case that squarely addresses the
issue we now face.
 Statutory language--always the starting point,
Petitioning Creditors of Melon Produce, Inc. v. Braunstein, 112
F.3d 1232, 1237 (1st Cir. 1997)--lends some support to the
government's act-by-act approach. The Westfall Act speaks of
certification not of "the claim" but of "the incident out of which
the claim arose," 28 U.S.C. 2679(d); "incident" could easily be
equated with "act" or "event." We do not think that either of
Lyons' counters--that the word "incident" appears in the singular
and that other related statutory provisions (e.g., removal, 28
U.S.C. 2679(d)(2)) explicitly operate on a claim-by-claim basis--
are of much force.
 Nevertheless, it is hard to make too much of this
language where Congress may have assumed a rough equation of
"incident" and "claim" and where the problem in our case arises
from a failure of the equation. Nor do we have any direct evidence
of congressional intent derived from legislative history. Lyons'
argument that Congress did not intend to allow certification of
"egregious misconduct," H.R. Rep. No. 100-700, 100th Cong., 2d
Sess. 5 (1988), reprinted in 1988 U.S.C.C.A.N. 5945, 5949, does not
seem to us to bear directly on the "claim versus incident" issue
before us.
 In granting Westfall Act immunity, Congress aimed to
protect federal employees against personal lawsuits growing out of
their routine conduct of official business. See United States v.
Wood, 995 F.2d 1122, 1125-26 (1st Cir. 1993). The Federal Tort
Claims Act, 28 U.S.C. 1346(b), 2671-2680, had already made the
government liable for certain wrongful employee conduct within "the
scope of employment"; Congress simply provided in the Westfall Act,
contrary to ordinary tort law, that the employee would be immune to
suit for conduct within the scope of employment.
 Given the objective to protect conduct within the scope
of employment, we reject Lyons' notion that a plaintiff can defeat
certification merely by choosing to plead two different acts under
the heading of a single claim. Modern pleading is so flexible, and
causes of action so numerous, that it is often child's play to
combine as part of the same "claim" remotely related incidents. We
are far less concerned about the possibility suggested by Lyons
that a plaintiff might simply choose not to identify incidents in
the complaint, thereby frustrating any effort to certify specific
acts; discovery provides an easy remedy for that tactic.
 Lyons is right that the incident-by-incident approach may
increase the burden on the courts. It certainly would be quicker
to make an all or nothing judgment as to each multi-incident claim,
although not easy to invent a standard (would it be the
predominance of scope versus nonscope conduct within each claim?). 
But mechanisms--such as special masters--exist for dealing with
routine, serial disputes, and our major concern must be to
implement Congress' basic aim: to protect the employee for conduct
within the scope of employment but not outside it. See Wood, 995
F.2d at 1125.
 Finally, Lyons objects that the government, by certifying
discrete incidents, can carve the evidentiary heart out of a case
whose gravamen is a single course of conduct. But we see no reason
why, subject to the sound discretion of the district judge, conduct
within the scope of employment would automatically be excluded from
evidence if it were offered merely to show pattern, motivation or
anything else pertinent to imposing liability on the employee for
conduct that has not been certified. See United Mine Workers of
America v. Pennington, 381 U.S. 657, 670 n.3 (1965); cf. Fed. R.
Evid. 404(b). Of course, the jury ought to be told of the limited
purpose. See Fed. R. Evid. 105.
 We thus conclude that the district court should have
applied the scope test to acts or incidents, as the government
claims. The government, although urging reversal, says that the
district court has already developed the pertinent evidence and
urges this court to decide which incidents should be certified. 
See Ray v. Atlantic Richfield Co., 435 U.S. 151, 179 n.29 (1978). 
Dr. Pathak goes further, asking us to hold that the government
should have certified additional conduct. Lyons, by contrast, asks
for a remand to decide what should be certified. A remand cannot
be avoided, but we can and will narrow the issues for the remand.
 Under the Westfall Act, private action is barred against
an employee of the federal government for a "negligent or wrongful
act or omission of [the employee] . . . while acting within the
scope of his office or employment . . . ." 28 U.S.C. 2679(b)(1). 
Federal law determines whether a person is a federal employee and
defines the nature and contours of his official responsibilities;
but the law of the state in which the tortious act allegedly
occurred determines whether the employee was acting within the
scope of those responsibilities. Aversa v. United States, 99 F.3d
1200, 1208-09 (1st Cir. 1996). Here, only the latter issue is in
dispute.
 All sides appear to concur that the scope issue should be
determined under Maine law (although a few of the acts occurred
outside Maine). As elsewhere, the scope-of-employment issue in
Maine is normally resolved not to give immunity to the employee,
but to impose vicarious liability on an employer under the
respondeat superior doctrine. Maine's courts follow the tests set
forth in the Restatement (Second) of Agency 228 et seq. (1958). 
See McClain v. Training and Development Corp., 572 A.2d 494, 497
(Me. 1990). The Restatement's general rule 228 reads as follows:
 (1) Conduct of a servant is within the
 scope of employment if, but only if:

 (a) it is of the kind he is
 employed to perform;

 (b) it occurs substantially within
 the authorized time and space limits;

 (c) it is actuated, at least in
 part, by a purpose to serve the master,
 and 

 (d) if force is intentionally used
 by the servant against another, the use
 of force is not unexpectable by the
 master.

 (2) Conduct of a servant is not within
 the scope of employment if it is
 different in kind from that authorized,
 far beyond the authorized time or space
 limits, or too little actuated by a
 purpose to serve the master.

 The rule is given more content by a further 24 pages
containing subordinate rules, commentary and illustrations, seeRestatement, supra, 228-236, and by case law and rules of thumb. 
For example, usually--but not always--acts relating to work and
done in the workplace during working hours are within the scope,
see id. 229, 233, 234; negligent performance of duties is within
the scope, see id. 232-233, while serious intentional wrongdoing
is outside it, see id. 231 & cmt. a.; and the motivation of the
employee (to serve the master's interests or his own) is often an
important element, see id. 235-236.
 Set forth in an appendix to this opinion is the full text
of each paragraph listed by the U.S. Attorney as certified. Most
of the acts in these 22 paragraphs appear on their face to be work-
related. For example, paragraph 59 says that "[i]n August 1994,
Dr. Pathak logged a Complaint with William Harnass and Dr. Holyoke,
Chief of Staff, against Mrs. Lyons." Paragraph 115 says, "[o]n
February 23, 1995, Dr. Pathak announced to the Renal Dialysis Unit
that 'they' were considering closing the Renal Dialysis Unit." 
Paragraph 129 says:
 On March 13, 1995, without telling Mrs. Lyons,
 Dr. Pathak withdrew Togus from the dialysis
 research study. The study had been the
 purpose of the June, 1994 trip to Chicago and
 would have enhanced Ms. Lyons' standing in the
 nephrology community.

 Under Wood v. United States, 995 F.2d 1122 (1st Cir.
1993), the district court in deciding the immunity issue must
assume that the "harm-causing incident" alleged by the plaintiff
did occur and must then resolve issues regarding the
"characterization of the incident and subsidiary immunity-related
facts." Id. at 1129. Here, Dr. Pathak's filing of a complaint and
withdrawal from the dialysis research study were obviously work-
related in the sense that these acts might have been taken to serve
his employer; but they could also prove to be outside the scope of
employment if they were done instead with a private purpose on Dr.
Pathak's part to retaliate against Lyons for rejecting his
advances.
 If the complaint or the treatment of the study were done
in good faith to serve the employer's interests, then the conduct
was likely within the scope of employment even if Dr. Pathak's
judgment was mistaken. Restatement, supra, 232-33; cf. Nasuti,
906 F.2d at 808. Conversely, whatever justification Dr. Pathak
might have for his actions could be overcome if his actual purpose
was to retaliate, a motive that would convert his conduct into
"serious intentional wrongdoing" outside the scope of employment. 
Restatement, supra, 231 & comment a; cf. Wood, 995 F.2d at 1123. 
Of course, whether the conduct was objectively justified might play
some evidentiary role in helping the judge decide whether the
doctor's motive was professional or personal.
 In challenging the U.S. Attorney's certificate, the
burden is upon Lyons to prove any facts needed to contradict the
government's characterization of the conduct in dispute. SeeRogers v. Management Technology, Inc., 123 F.3d 34, 36-37 (1st Cir.
1997); Nasuti, 906 F.2d at 808. On remand, Lyons is entitled to
challenge the certificate as to each of the 22 certified
paragraphs. For example, Lyons asserts that Dr. Pathak did not
honestly believe that the complaint he filed against her was true,
and she asserts that Dr. Pathak's superiors had no intention of
closing the dialysis unit. If her proffer so warrants, and the
facts alleged are in controversy, then an evidentiary hearing may
be required.
 We turn now to Dr. Pathak's claim that the U.S. Attorney
erred in refusing to certify other acts, apart from the 22
paragraphs, as within the scope of employment. For example, Dr.
Pathak suggests that his alleged statement to Lyons that he "loved"
her should be regarded as a misunderstood attempt by him to solve
a workplace disagreement; his choice of words, he says, reflects
the fact that English is not his native language. Although a few
examples of this kind are given, Dr. Pathak's principal argument on
appeal is that the district court erred in refusing to consider his
claims on an act-by-act basis. We agree for reasons already
stated.
 If Dr. Pathak chooses on remand to pursue such claims, he
(like Lyons) will bear the burden of proof in moving for
certification under 2679(d)(3). It will be up to him to offer
whatever evidence is necessary to persuade the district judge that
an individual alleged act, not found by the U.S. Attorney to be
within the scope of employment, falls within the scope of
employment. And in soliciting a finding by the district court
(e.g., as to the motivation or circumstances surrounding an alleged
act), Dr. Pathak (like Lyons) confronts the risk that an adverse
determination may turn out to be harmful to him in the trial
itself.
 The order of the district court striking the U.S.
Attorney's certificate is vacated, and the matter is remanded to
the district court for further proceedings consistent with this
opinion.
 It is so ordered. APPENDIX

 52. The Defendant said, no one would do anything unless
Ms. Lyons said so and that the plaintiff was "walking around in her
white coat and high heels like she was a big person."

 53. For the next three months, Dr. Pathak undertook a
continuing course of harassment against Ms. Lyons which centered
around work related issues.

 55. Dr. Pathak would not communicate with Ms. Lyons,
canceled meetings and, most importantly, publicly questioned Ms.
Lyons's professional judgment on issues of critical labs, patient
orders and the like.

 59. In August 1994, Dr. Pathak logged a Complaint with
William Harness and Dr. Holyoke, Chief of Staff, against Ms. Lyons.

 61. The Complaint alleged that Ms. Lyons had maliciously
locked Dr. Pathak out of the Dialysis Unit. Ms. Lyons never locked
Dr. Pathak out of the Dialysis Unit. The Plaintiff expressed her
concerns to Dr. Beaupre who told her not to take it seriously
because we know it's not you.

 69. On August 31, 1994, Ms. Lyons approached the
Defendant Pathak with a list of suggestions as requested by Dr.
Beaupre. Dr. Pathak responded, "I don't want to talk to you."

 88. Dr. Pathak also asked Joe Morelli, a police officer
at Togus, to question Ms. Lyons about missing log books.

 91. On November 26, 1994, Dr. Pathak dictated in a
patient HX and Physical that "the patient's family talked with the
head nurse, Ms. Daigle."

 115. On February 23, 1995, Dr. Pathak announced to the
Renal Dialysis Unit that "they" were considering closing the Renal
Dialysis Unit.

 129. On March 13, 1995, without telling Ms. Lyons, Dr.
Pathak withdrew Togus from the dialysis research study. The study
had been the purpose of the June, 1994 trip to Chicago and would
have enhanced Ms. Lyons' standing in the nephrology community.

 130. Throughout March of 1995, Dr. Pathak continued to
avoid Ms. Lyons at work and refused to speak with her. This made
it extremely difficult for Ms. Lyons to do her job because Dr.
Pathak was the director of the unit and directly responsible for
providing Ms. Lyons with critical patient care information.

 131. From November, 1994 through the present, Ms. Lyons
has kept management updated about Dr. Pathak's behavior and the
risk to patient care it has created, but nothing has changed.

 132. On March 16, 1995, Ms. Lyons paged the Defendant
with a question about patient care and Dr. Pathak refused to talk
to Ms. Lyons.

 133. On March 21, 1995, Ms. Lyons again attempted to
talk to Dr. Pathak about a patient care issue, but only after
repeated requests did Dr. Pathak supply her any information. Then,
the information he gave was minimal.

 134. Throughout March of 1995, Dr. Pathak refused to
attend Renal Dialysis Unit staff meetings or do rounds with Ms.
Lyons.

 135. On March 31, 1995, Ms. Lyons questioned Dr. Pathak
about a patient care situation needing immediate information and
Dr. Pathak refused to talk with her.

 140. On April 8, 1995, Ms. Lyons again tried to talk to
Dr. Pathak about a patient care issue, but Dr. Pathak refused to
even take her call. Ms. Lyons had to track Dr. Pathak down through
the hospital before he would talk to her.

 142. Dr. Pathak unreasonably and without discussion
refused to allow the patient to see the video and ordered that the
patient receive no more information about the treatment.

 145. On May 15, 1995, Dr. Pathak scheduled two patients
to come to the Renal Dialysis Unit but purposely refused to tell
Ms. Lyons they were coming.

 147. On May 24, 1995, in front of a fellow nurse, Ms.
Lyons asked Dr. Pathak a specific question regarding preparing for
transient dialysis patients. Dr. Pathak refused to answer her. 
She asked him another question and he refused to talk to her.

 148. Throughout the week of May 25, 1995, Dr. Pathak
refused to talk to Ms. Lyons at all. Dr. Pathak even planned the
transfer of patients off the unit without ever informing Ms. Lyons,
the head nurse.